**UNITED STATES of America**

v.

**William THOMAS, Appellant.**

**UNITED STATES of America**

v.

**Ellen THOMAS, Appellant.**

Nos. 88–3034, 88–3035.

United States Court of Appeals, District of Columbia Circuit.

Argued Nov. 8, 1988.

Decided Dec. 30, 1988.

Mark A. Venuti, Washington, D.C., (appointed by the court), for appellants in Nos. 88–3034 and 88–3035.

Edith S. Marshall, Asst. U.S. Atty., with whom Jay B. Stephens, U.S. Atty., John D. Bates and R. Craig Lawrence, Asst. U.S. Attys., Washington, D.C., were on the brief, for appellee.

Before WALD, Chief Judge, and STARR and SENTELLE, Circuit Judges.

Opinion for the Court filed by Circuit Judge STARR.

STARR, Circuit Judge:

Lafayette Park, as Washington residents and visitors well know, sits across Pennsylvania Avenue from the White House. It is a lovely park, beautifully landscaped and exquisitely maintained. On its north side stands St. John's Church, the church of Presidents, and the historic Hay–Adams Hotel. Looking out on the park are government buildings of some note, not the least of which are the National Courts Building, Dolley Madison House and the Decatur House. By virtue of its singular location, Lafayette Park has become a haven for First Amendment activity. The keen governmental interest in maintaining the beauty and tranquility of this historic park has thus increasingly come into conflict with the equally keen interest on the part of various individuals and groups in expressing their viewpoints on significant issues of our age.

Like the now-legendary "sleeping in the park" case, *Clark v. Community for Creative Non–Violence*, 468 U.S. 288, 104 S.Ct. 3065, 82 L.Ed.2d 221 (1984), the case before us involves individuals who are seeking by their continuing presence in the park to convey and communicate their sincerely held views about what they perceive to be the most elemental social ills. Two individuals, husband and wife, stand convicted for violation of the applicable Park Service regulations which forbid "camping" in areas including Lafayette Park. The challenge mounted by William and Ellen Thomas to their respective convictions sounds both in a substantiality of the evidence attack and in the familiar doctrine of void-for-vagueness, drawn from the body of First Amendment and Due Process law. For the reasons that follow, we conclude that the Thomases' challenge cannot succeed and that their convictions must therefore stand.

## I

Ellen and William Thomas have for several years pursued a vigil in Lafayette Park that entails what William Thomas terms a "continuous presence" in the Park. (Tr. 107). Ellen Thomas describes their vigil as "[an] attempt[ ] to maintain a constant, all-weather, round-the-clock expressive presence in Lafayette Park." Def. (E.T.) Exhibit 7. The Thomases have abandoned most worldly possessions and pursuits to alert whoever might pass by—through discussion, their signs, and their presence—of the threat of nuclear annihilation and the evils they perceive as having created that threat. They do have access to and use of a nearby apartment, where they store most of their few belongings, eat, shower, use the bathroom, pursue their correspondence, and attend to other such functions. However, they do not, except inadvertently, sleep in the apartment. Indeed, William Thomas claims to have sloughed off the need for regular sleep along with other attributes of worldly existence, and thus to sleep nowhere in particular unless overcome by exhaustion and forced to nap.

The Thomases pursued this pattern of activity during the week of March 22 through March 29, 1987. Park Service officers observed them on several occasions lying prone at night upon or within bedding material, surrounded by bundles of goods, occasionally under a plastic sheet, and, by all appearances, asleep. Several times, officers verbally warned the Thomases that they were in violation of the Park Service's prohibition against "camping," and issued four citations to that effect.

The Park Service regulation in question lists several indicia of "camping":

> Camping is defined as the use of park land for living accommodation purposes such as sleeping activities, or making preparations to sleep (including the laying down of bedding for the purpose of sleeping), or storing personal belongings, or making any fire, or using any tents or shelter or other structure or vehicle for sleeping or doing any digging or earth breaking or carrying on cooking activities. The above-listed activities constitute camping when it reasonably appears, in light of all the circumstances, that the participants, in conducting these activities, are in fact using the area as a living accommodation regardless of the intent of the participants or the nature of any other activities in which they may also be engaging....

36 C.F.R. § 7.96(i)(1) (1988).

The United States Attorney's Office issued an information against the Thomases for their conduct during the week in question and prosecuted them for impermissibly camping in the Park. Following a bench trial before Judge Flannery, the Thomases were found guilty; the trial court reasoned that the regulation "does not permit individuals to spend substantially all of their time, including sleeping hours, in the park on a continuing basis." Memorandum Opinion, Crim. No. 87–0231 at 16 (D.D.C. Feb. 5, 1988). Although the court did not define precisely what use of the park constituted "use for living accommodation purposes," it found "that lying on top and within bedding materials throughout the night, for a one-week period, without evi-

dence of any other sleeping quarters, is sufficient evidence of the use of the park for living accommodations." *Id.* at 17.

The District Court thereafter denied the Thomases' motion to stay their 30–day sentences pending appeal. Despite having served their sentences, the Thomases appeal the verdict, alleging that insufficient evidence exists to support the convictions and that the regulation is unconstitutionally vague as applied to them.

## II

The Thomases assert primarily that the government adduced insufficient evidence to support their convictions. We respectfully but emphatically disagree.

## A

■ The standard governing our review is well settled and understood. On appeal, a reviewing court is to accord a guilty verdict great deference; indeed, the sole evidentiary issue in such instances is whether substantial evidence supports the verdict. "The governing standard for reviewing the sufficiency of the evidence in non-jury cases is the same as that applied in jury cases: The conviction must be reversed when the evidence is such that a reasonable mind could not find guilt beyond a reasonable doubt." *United States v. Castellanos,* 731 F.2d 979, 984 (D.C.Cir. 1984); *see United States v. James,* 764 F.2d 885, 889 (D.C.Cir.1985) ("we cannot overturn the verdict unless a reasonable jury must necessarily have entertained a reasonable doubt"); *Jackson v. United States,* 353 F.2d 862, 864 (D.C.Cir.1965) (same standard applied to review of bench and jury trials) (Wright, J.). Our review of the record must also accord great weight to the factfinder's role, while providing no incentive for the parties to retry the case on appeal. "Our task ... is to view the evidence in the light most favorable to the government, allowing the government the benefit of all reasonable inferences that may be drawn from the evidence, and permitting the [factfinder] to determine the weight and credibility of the evidence." *United States v. Sutton,* 801 F.2d 1346,

1358 (D.C.Cir.1986); *see United States v. Weisz,* 718 F.2d 413, 437 (D.C.Cir.1983), *cert. denied,* 465 U.S. 1027, 104 S.Ct. 1285, 79 L.Ed.2d 688 (1984); *United States v. Singleton,* 702 F.2d 1159, 1162–63 (D.C.Cir. 1983). This standard applies to both direct and circumstantial evidence. *See Sutton,* 801 F.2d at 1358; *see also Holland v. United States,* 348 U.S. 121, 75 S.Ct. 127, 99 L.Ed. 150 (1954).

## B

■ In light of the governing standard, we are satisfied that several sources of evidence in the record provide ample support for the verdicts. *First.* Three officers testified about what they observed during the period that included the four occasions when they issued citations to the Thomases for violating the regulation. As the District Court concluded, "[t]he testimony of the Park Police officers established that during the period in question, defendants were observed at numerous times late at night and in the early morning to be lying prone, on bedding materials, with their eyes closed." Mem.Op. at 15. Here is the substance of that testimony.

(1) Park Police Officer Richard DeRiso testified that at approximately 6:00 a.m. on March 22, he observed the Thomases lying in sleeping bags and on blankets, surrounded by clothes. The officer saw no activity and heard sounds that to him resembled snoring. He woke the Thomases, told them that they were violating the camping regulation, and cited them for the violation. According to the officer, the Thomases were in roughly the same circumstances on the morning of March 27, and he again gave them a citation. On cross-examination, Officer DeRiso indicated that on both occasions he may have actually issued the citations later in the morning.

(2) Patrol Officer Daniel DeLullo testified that he observed the Thomases at their demonstration site three times during the night of March 25 and morning of March 26. The first time, at 10:00 p.m., the Thomases were sitting on sleeping bags and blankets, surrounded by minor items of

property and their literature, which was covered by plastic. An hour later, the Thomases were lying in their sleeping bags, which in turn were covered by plastic, and the Thomases appeared to Officer DeLullo to be asleep. The officer lifted the plastic to warn them that they were violating the camping regulation. Little had changed the third time, at 12:10 a.m. After briefly observing the Thomases from one foot away and discerning no activity, Officer DeLullo issued each of them a citation.

(3) Park Police Officer William Doerrler testified that at approximately 6:15 a.m. on March 29, he observed Ellen Thomas leaning against a sign and William Thomas lying down, covered by a blanket. He reported seeing them surrounded by heaps of clothing and bundles. Both appeared to be asleep. Officer Doerrler told the Thomases that they were violating the camping regulation and later issued each of them a citation.

*Second.* The Thomases' own admissions about their activities in Lafayette Park during the period in question provide further evidence supporting the convictions. The record amply supports the trial court's summary in this respect:

> Both defendants have testified that they spent most of their time in Lafayette Park and with occasional exceptions, spent every night there. William Thomas acknowledged that with the exception of the 'involuntary' naps he took when out of the park, whatever sleeping he did was done in the park. Ellen Thomas testified that she had the 'night shift' at their demonstration site in the park and did not testify that she slept anywhere else.

Mem.Op. at 15.

Indeed, the defendants' testimony largely confirms the officers' accounts, differing principally over the time they actually received certain citations and (especially on Ellen Thomas's part) over whether they were actually asleep while lying in their sleeping bags. Ellen Thomas testified that she spent entire nights in Lafayette Park, and was on the occasion in question prone,

in and on blankets and sleeping bags, and covered with plastic. (Tr. 218). William Thomas was more expansive. He opined that, although the government's evidence had established at most an hour and a half of sleeping during the four occasions, "[a]ccording to our testimony, I figure that we admit to having slept for about four hours and fifteen minutes in the park over the course of these four days." (Tr. 273). Mr. Thomas also described how he had been in the Park most of the day on March 21, and that at 10:00 p.m. that night Officer Doerrler had warned him and others in the Park that they were in violation of the camping regulation (prior to Mr. Thomas's admitted hour and a half of sleep later the morning of March 22 and prior to the citation issued by Officer DeRiso that morning). (Tr. 230, 232).

*Third.* The Thomases' description of how they conduct their "continuing vigil" supports reasonable inferences of violations of the anti-camping regulation. Ellen Thomas testified that, although she spends time away from the Park lobbying, writing, and communicating with the press, she spends from 12 to 20 hours per day in the Park. (Tr. 199–200). Two weeks after the period in question, Ellen Thomas wrote to the Park Service that "I have been attempting to maintain a constant, all-weather, round-the-clock expressive presence in Lafayette Park, without living accommodations...." Def. (E.T.) Exhibit 7. During the pivotal week in late March, she was pursuing her ongoing vigil, namely staying in the Park with her signs, "demonstrating my commitment to the necessity to spend as much time as possible to eliminate nuclear weapons." (Tr. 196–97). William Thomas states that his "main, practical purpose is a symbolic purpose to my being [in the Park], but practically my purpose is that I can be available at all times for clarification of actual reality." (Tr. 252). William Thomas testified that he spent most of his time from March 21 to 26 in the Park, leaving to go to a court appearance and twice to go to the nearby apartment. (Tr. 238). Although both use the apartment for tasks such as cooking, cleaning clothes, using the telephone, and writing, neither

testified to sleeping (except inadvertently) or spending significant amounts of time there. William Thomas claimed that "the object of my life is to live without accommodations, and to me [the apartment] is a compromise." (Tr. 240).

## C

The Thomases' criticisms of the very substantial evidence arrayed against them are misplaced. They argue repeatedly that no matter what the police briefly observed or no matter that they (the Thomases) occasionally dozed off, they were not "sleeping" in the park in a sense relevant to the anti-camping regulation. William Thomas argues that "[p]ersonally, I don't consider what I do to be sleeping, I consider it to be intermittent naps." (Tr. 301); *see* Brief for Appellants at 12. This argument, on analysis, misses the mark. *First,* the regulation cites "sleeping activities" as an indicia of using the park as a living accommodation. Someone who lies down motionless in blankets or sleeping bags at night might reasonably be considered to be engaged in sleeping activities. Meditating, resting, napping, and actually sleeping all fall within the regulation and add weight to the contextual determination that the Thomases were indeed using the park as a *living accommodation,* which is the critical point under the Park Service regulation ("[c]amping is defined as the use of park land for living accommodation purposes ...."). In short, the physical condition of sleep is not the *sine qua non* of "camping" under the regulation; the *sine qua non* is, rather, the use of the park for living purposes.

*Second,* circumstantial evidence appropriately counts in the evidentiary calculation. Courts routinely accept objective indications as evidence for subjective or otherwise unverifiable states of mind. Specifically, in the context before us, the factfinder is permitted to rely upon the Park Service Officers' testimony that the Thomases were by all outward appearances asleep, although of course the Thomases are free to argue that their activities actually were of a relevantly different character that is beyond the scope of the regulation.

*Third,* and more generally, the factfinder is permitted to draw reasonable inferences from the evidence adduced. This observation addresses defendants' arguments that the officers observed too little sleep and otherwise observed them for a small part of the week. *See* Brief for Appellants at 24–27. Evidence of specific incidents observed by the officers, the Thomases' own admissions, and the admitted nature of the vigil permit inferences of patterns of use of the park and presumed repetition of observed behavior. The Thomases, in contrast, attempt to define their behavior as only that which the direct evidence immediately and ineluctably proves. That is much too Procrustean an evidentiary approach; the law is not nearly so impractically tunnel-visioned in outlook. To the contrary, the factfinder is permitted to draw reasonable inferences, which readily include conclusions of ongoing and pervasive patterns of conduct. *See supra* p. 191 (government allowed benefit of inferences).

## D

Under the appropriate standard of review, *see supra* p. 191, substantial evidence supports Judge Flannery's conclusion that the defendants were "lying on top and within bedding materials throughout the night, for a one-week period, without evidence of any other sleeping quarters." Mem.Op. at 17. Accepting the trial court's resolution of conflicts in the testimony, *id.* at 15–16; viewing the evidence in the light most favorable to the government; and accepting the direct and circumstantial evidence of guilt; we concluded that a reasonable fact-finder would by no means be obliged to conclude that either of the Thomases was not guilty. To the contrary, the District Court could readily conclude, as it did, that "beyond a reason[a]ble doubt ... defendants laid down bedding for the purpose of sleeping and slept in the park with such frequency and for such periods of time as to constitute camping in violation of 36 C.F.R. [§] 7.96(i)(1)." *Id.* at 16.

In addition, the court could readily rely, as it did, upon the duration of the Thomases' residence in the Park (during the day

and nearly every night) and upon the lack of another place for the Thomases to sleep or pass substantial amounts of time (as opposed to the less time-consuming activities pursued in the nearby apartment) to conclude that "defendants William Thomas and Ellen Thomas used Lafayette Park for living accommodation purposes." *Id.* at 15. In sum, substantial evidence supports the convictions.

### III

On a loftier plane, the Thomases argue that, whatever the quantum of evidence as to their activities, it is unclear that their activities fall within the scope of the anti-camping regulation. They vigorously assert that the regulation is so unclear that it is unconstitutionally vague as applied to their conduct here.

### A

### 1

Two principal concerns undergird the requirement that governmental enactments be sufficiently precise: *first,* that notice be given to those who may run afoul of the enactment and, *second,* that the enactment channel the discretion of those who enforce it. The principle is an important one to a free people. The Due Process Clause's prohibition against vague restrictions "requires that a penal statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." *Kolender v. Lawson,* 461 U.S. 352, 357, 103 S.Ct. 1855, 1858, 75 L.Ed.2d 903 (1983); *see Hoffman Estates v. Flipside, Hoffman Estates, Inc.,* 455 U.S. 489, 498, 102 S.Ct. 1186, 1193, 71 L.Ed.2d 362 (1982); *Grayned v. City of Rockford,* 408 U.S. 104, 108–09, 92 S.Ct. 2294, 2298–99, 33 L.Ed.2d 222 (1972). The Supreme Court has further taught "that the more important aspect of the vagueness doctrine 'is not actual notice, but the other principal element of the doctrine—the requirement that the legislature establish minimal guidelines to govern law enforcement.'" *Kolender,* 461 U.S. at 358, 103

S.Ct. at 1858 (quoting *Smith v. Goguen,* 415 U.S. 566, 574, 94 S.Ct. 1242, 1247, 39 L.Ed.2d 605 (1974)).

When the criminal penalty at issue applies to activity that furthers First Amendment interests, as the Thomases' protest most certainly did, the court is obliged to review the challenged enactment with particular care. Indeed, when the enactment threatens exercises of otherwise permissible First Amendment rights, the enactment must provide more notice and allow less discretion than for other activities. *See Big Mama Rag, Inc. v. United States,* 631 F.2d 1030, 1035 (D.C.Cir.1980) ("These standards [protecting against vague enactments] are especially stringent, and an even greater degree of specificity is required, where, as here, the exercise of First Amendment rights might be chilled by a law of uncertain meaning."); *see also Smith v. Goguen,* 415 U.S. at 573, 94 S.Ct. at 1247; *NAACP v. Button,* 371 U.S. 415, 433, 83 S.Ct. 328, 338, 9 L.Ed.2d 405 (1963).

In contexts other than the First Amendment, it is often sufficient that the proscription mark out the rough area of prohibited conduct, allowing law-abiding individuals to conform their conduct by steering clear of the prohibition. *See Rose v. Locke,* 423 U.S. 48, 50, 96 S.Ct. 243, 244, 46 L.Ed.2d 185 (1975) ("All the Due Process Clause requires is that the law give sufficient warning that men may conduct themselves so as to avoid that which is forbidden."). When an enactment is challenged as vague in its application in a First Amendment context, however, the court must focus instead upon whether the enactment provided fair notice that the defendant's contemplated conduct fell within the legitimate scope of the prohibition. *See Keeffe v. Library of Congress,* 777 F.2d 1573, 1582 (D.C.Cir.1985) ("We examine whether Keeffe had fair notice ... that her [contemplated activity implicating First Amendment interests] was legitimately proscribed...."); *see also Palmer v. Euclid,* 402 U.S. 544, 545–46, 91 S.Ct. 1563, 1564, 29 L.Ed.2d 98 (1971) (not First Amendment context); *United States v.*

*Harriss,* 347 U.S. 612, 617, 74 S.Ct. 808, 811, 98 L.Ed. 989 (1954) (Due Process Clause requires "fair notice that ... contemplated conduct is forbidden by the statute").

At the same time, we cannot forget that language is unavoidably inexact, *cf. Young v. Community Nutrition Institute,* 476 U.S. 974, 106 S.Ct. 2360, 90 L.Ed.2d 959 (1986), and that statutes cannot, in reason, define proscribed behavior exhaustively or with consummate precision. These inherent limitations obtain in a speech-laden, First Amendment setting as in any other. As the Supreme Court observed in *Smith v. Goguen,* 415 U.S. at 574, 94 S.Ct. at 1247, "[w]e recognize that in a noncommercial context behavior as a general rule is not mapped out in advance on the basis of statutory language." For this reason, courts do not require that an enactment touching on First Amendment interests set forth the precise line dividing proscribed from permitted behavior, or that a person contemplating a course of behavior know with certainty whether his or her act will be found to violate the proscription. Rather, even in this sensitive area the Due Process Clause requires that the enactment be drafted with reasonable specificity sufficient to provide fair notice. *See, e.g., id.* ("The statutory language under which Goguen was charged, however, fails to draw *reasonably clear lines* between the kinds of nonceremonial treatment [of the American flag] that are criminal and those that are not.") (emphasis added); *Grayned,* 408 U.S. at 110, 92 S.Ct. at 2299 ("The words of the Rockford ordinance are marked by flexibility and reasonable breadth, rather than meticulous specificity, but we think it is clear what the ordinance as a whole prohibits.") (internal quotation omitted); *Coates v. Cincinnati,* 402 U.S. 611, 614, 91 S.Ct. 1686, 1688, 29 L.Ed.2d 214 (1971) (a city that enacts time, place, and manner restrictions affecting expressive activity "can do so through the enactment and enforcement of ordinances directed with reasonable specificity toward the conduct to be prohibited"). As the Court reasoned in a sensitive First Amendment area (while considering the validity of less than precise regulations):

> [T]here are limitations in the English language with respect to being both specific and manageably brief, and it seems to us that although the prohibitions may not satisfy those intent on finding fault at any cost, they are set out in terms that the ordinary person exercising ordinary common sense can sufficiently understand and comply with, without sacrifice to the public interest.

*United States Civil Serv. Comm'n v. National Ass'n of Letter Carriers,* 413 U.S. 548, 578–79, 93 S.Ct. 2880, 2897, 37 L.Ed.2d 796 (1973); *see Broadrick v. Oklahoma,* 413 U.S. 601, 608, 93 S.Ct. 2908, 2913, 37 L.Ed.2d 830 (1973).

2

More specific to the question at hand, the Supreme Court's pronouncements on the precision of the predecessor of the very regulation now before us also channel and circumscribe our inquiry. In three ways, the Court's conclusions in *Clark v. Community for Creative Non–Violence,* 468 U.S. 288, 104 S.Ct. 3065, 82 L.Ed.2d 221 (1984) [hereinafter *"CCNV"*], measurably further our consideration and analysis. *First,* the Court there upheld a regulation essentially identical to 36 C.F.R. § 7.96(i)(1) against a series of challenges. The Court held the regulation to be both a permissible time, place and manner restriction, and a permissible regulation of symbolic conduct. *CCNV,* 468 U.S. at 294, 298–99, 104 S.Ct. at 3069, 3071–72. More importantly for our purposes, the Court upheld the regulation against an assertion that it was unconstitutionally vague, *id.* at 292, 104 S.Ct. at 3068, and concluded that "it cannot seriously be doubted that sleeping in tents for the purpose of expressing the plight of the homeless falls within the regulation's definition of camping." *Id.* at 292 n. 4, 104 S.Ct. at 3068 n. 4, *see also Community for Creative Non–Violence v. Watt,* 703 F.2d 586, 591 & n. 6 (D.C.Cir.1983) (en banc) [hereinafter *"Watt"*] (Mikva, J.), *rev'd on other grounds, CCNV,* 468 U.S. at 288, 104 S.Ct. at 3065; *id.* at 610 (Wilkey, J., dissenting) ("[T]he regulations give fair notice of the

prohibited conduct and provide sufficiently explicit standards to guide the discretion of law enforcement officials. They are not impermissibly vague.").

*Second,* the Court indicated some of the applications of the content-neutral regulation—and especially that element prohibiting sleeping—that would not infringe unduly upon First Amendment interests.

> [T]he Park Service neither attempts to ban sleeping generally nor to ban it everywhere in the parks. It has established areas for camping and forbids it elsewhere, including Lafayette Park and the Mall. Considered as such, we have very little trouble concluding that the Park Service may prohibit overnight sleeping in the parks involved here.

*CCNV,* 468 U.S. at 295, 104 S.Ct. at 3069. Similarly, the fact that the regulation would in effect prohibit or deter otherwise valid expression protected by the First Amendment did not vex the Court: "With the prohibition, however, as is evident in the case before us, at least some around-the-clock demonstrations lasting for days on end will not materialize, others will be limited in size and duration, and the purposes of the regulation will thus be materially served." *Id.* at 297, 104 S.Ct. at 3071.

*Third,* both the Supreme Court's and this court's discussion of the nature of the regulation sheds helpful light as to its clarity. Wide agreement existed that the pursuit of expressive activities did not remove that activity from the scope of the regulation. *See id.* at 294, 104 S.Ct. at 3069. ("That sleeping ... may be expressive ... does not make the ban any less a limitation on the manner of demonstrating...."); *Watt,* 703 F.2d at 591 (Mikva, J.), at 610 (Wilkey, J., dissenting), *rev'd on other grounds, CCNV,* 468 U.S. at 288, 104 S.Ct. at 3065. Also, in the context presented (including the existence of tents), the Court read the regulation to prohibit "overnight sleeping." *See CCNV,* 468 U.S. at 293, 295, 104 S.Ct. at 3068, 3069. Finally, the regulation necessarily involved a contextual evaluation:

> There is no *single* activity that automatically triggers the application of these sections.... Only when all the

circumstances are taken into account can it be determined with certainty whether a particular person or group is 'camping' within the meaning of the regulations.

The determination required is not a difficult one. We all have a common-sense understanding of what camping is, and the regulations aid that understanding by giving specific examples of activities that constitute camping 'when it reasonably appears, in light of all the circumstances, that the participants, in conducting these activities, are in fact using the area as a living accommodation....'

*Watt,* 703 F.2d at 610 (Wilkey, J., dissenting) (quoting 47 Fed.Reg. 24,302 (1982)), *rev'd on other grounds, CCNV,* 468 U.S. at 288, 104 S.Ct. at 3065.

### B

■ We have laid out in rather fulsome fashion the general principles that guide our analysis, because we are of the view that those principles readily suggest that, as applied to the Thomases, the anti-camping regulation was not unconstitutionally vague.

To be sure, the vagueness doctrine's fundamental concern that parties have fair notice that they are subject to an enactment is quite plainly implicated in this case. At first blush, the Thomases appear to be likely candidates for securing the Due Process Clause's protection. They sought to understand the scope of the regulation, received often less than edifying responses from Park Service (or other Interior Department) personnel, and in some ways conformed their behavior to accord with their understanding of the anti-camping regulation. As their counsel poignantly stated at oral argument, the Thomases are sincerely seeking to be law-abiding citizens.

Even so, the regulation was not unconstitutionally vague as applied to them. For the reasons set forth below, we believe that the Thomases received fair notice that their contemplated course of conduct fell within the legitimate scope of the regulation. In part no doubt because they view their vigil (requiring as it does a "continuing pres-

ence" in Lafayette Park), as their lives' mission, the Thomases persisted in their course of conduct in the face of that notice, and the prosecution at issue, unsurprisingly, resulted.

## 1

Our inquiry into whether the Thomases had, for constitutional purposes, fair notice of the scope of the regulation begins naturally enough by returning to the regulation's language. As we saw before, the regulation begins by defining camping as "the use of park land for living accommodation purposes." 36 C.F.R. § 7.96(i)(1). Essentially residing in Lafayette Park—spending, as the Thomases did, nearly all of one's time in the Park, including the night hours, and continuing for years without significant interruption—might fairly be said to fall rather clearly within this central element of the definition. But if doubt remains, the regulation elaborates its pivotal definition with indicia that, listed in the alternative, indicate what is meant by "use of park land for living accommodation purposes." The first three of seven listed indicia even more clearly gave the Thomases fair notice that the regulation applied to their "continuous presence" in the Park: "sleeping activities, or making preparations to sleep (including the laying down of bedding for the purpose of sleeping), or storing personal belongings...." *Id.* Again, to the ordinary reader, these words readily apply to the act of lying prone each night and early morning in sleeping bags and on blankets, motionless, with eyes shut, and surrounded by bags and (perhaps) clothing. Recasting the subjective behavior as "napping" or suggesting it to be meditating does not erase the element of notice. Lest any citizen unreasonably believe that the listed activities for some reason are not "camping" when pursued for nobler ends, the regulation seeks to put them, too, on clear notice as to its scope: "The above-listed activities constitute camping ... regardless of the intent of the participants or the nature of any other activities in which they may also be engaging." *Id.*

Additionally, the regulation's explicit terms indicate that context, and a contextual evaluation of many of the listed factors, determines the scope of the regulation. *See id.* ("The above-listed activities constitute camping when it reasonably appears, in light of all the circumstances, that the participants, in conducting these activities, are in fact using the area as a living accommodation...."). This point is worth pausing to dwell on, because the regulation's clear statement of a contextual evaluation should indicate two things to a reasonable reader. First, no one of the exemplary indicia (for example, "sleeping activities") can be considered in isolation, either from the others or from the actual circumstances in which the activity is conducted. Thus, the fact that the regulation does not cover a lunch-time nap bears little upon whether the regulation nonetheless gives fair notice that it prohibits dozing off at night, surrounded by bits of personal property, when lying in blankets and a sleeping bag, for nights on end, in the midst of maintaining a "continuous presence" at the site for several years. A contextual inquiry is a matter of reasoning from and delimiting ideal types (or paradigms), and the observation that the paradigms of "lunch nap" and "camping" may share an element of an hour's sleep does not collapse the types or render vague the manifest distinction between them. *But cf. Thomas v. United States,* 696 F.Supp. 702, 708–09 (D.D.C. 1988). It can be said that no distinction can be drawn between such varied acts only if no "core concept" underlies the prohibited behavior. The lack of a "core concept" is the hallmark of a prohibition that is unconstitutionally vague. *See Smith v. Goguen,* 415 U.S. at 578, 94 S.Ct. at 1249; *Coates,* 402 U.S. at 614, 91 S.Ct. at 1688. Here, "camping" does have such a basic or unifying concept—the use of land for living accommodation purposes—which the regulation elucidates in detail.

Second, the contextual inquiry does not regulate behavior by drawing bright lines and then defining the quantum of each of the various indicia sufficient to comprise the prohibited activity. The regulation does not, and as we have seen need not, define the prohibited conduct precisely.

While interests furthered by the Due Process Clause and the First Amendment favor such regulation by bright lines, we are quite unprepared to hold that the Due Process Clause prohibits a contextual regulation. Reading such a requirement into the Clause would likely invalidate most criminal statutes and administrative regulations. Even in the First Amendment realm, statutes cleaving to the exact language of Supreme Court requirements would fail such a test. *Cf. Miller v. California*, 413 U.S. 15, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973); *Brandenburg v. Ohio*, 395 U.S. 444, 89 S.Ct. 1827, 23 L.Ed.2d 430 (1969). Such an approach would require precision far beyond that required in the due process cases that guide our inquiry. *See supra* pp. 194–95. And it would condemn a standard that provides far more notice in this case than that which appears to have been provided by standards scrutinized by the Supreme Court for vagueness under the Due Process Clause. *Cf., e.g., Kolender*, 461 U.S. at 352, 103 S.Ct. at 1855 (striking a requirement that "credible and reliable" identification be presented); *Smith v. Goguen*, 415 U.S. at 566, 94 S.Ct. at 1242 (striking prohibition punishing one who "treats contemptuously the flag of the United States"); *Letter Carriers*, 413 U.S. at 548, 93 S.Ct. at 2880 (upholding regulations containing phrases such as "actively participating in a fund-raising activity" and "[t]aking an active part in managing [a] political campaign"); *Grayned*, 408 U.S. at 104, 92 S.Ct. at 2294 (upholding a statute prohibiting "the making of any noise or diversion which disturbs or tends to disturb [interpreted as "imminent interference" with] the peace or good order of such school session . . .").

Indeed, as long as we find (as we readily do) that the Thomases had fair notice that the regulation legitimately applied to their contemplated conduct, we are barred from concluding that the regulation is unconstitutionally vague as applied because it provides no bright lines to guide conduct different from the conduct before us. A line of reasoning that would require bright lines, or that concludes that the regulation is vague as applied here because cases less clear than the Thomases' may exist, is in its nature review of the facial validity of the regulation. The court may in other circumstances, but not in this case, imagine how a statute or regulation might apply in cases other than that under review when an enactment threatens to chill expressive activities, and that review considers the overbreadth or facial validity of the challenged enactment. *See Broadrick*, 413 U.S. at 613–16, 93 S.Ct. at 2916–18 (describing limits on overbreadth analysis and on the ability to assert others' claims even in the First Amendment context, and cautioning, 413 U.S. at 615–16, 93 S.Ct. at 2917–18, that once the court rejects a facial challenge, "whatever overbreadth may exist should be cured through case-by-case analysis of the fact situations to which [the enactment's] sanctions, assertedly, may not be applied"). *CCNV* has settled that issue of overbreadth and facial validity for the camping regulation, *see supra* pp. 195–196, and even if we wished to reopen the issue, we are of course powerless to do so.

2

Beyond the notice provided by the regulation's language, the Thomases also received actual notification that their "continuing presence" violated the regulation. The record reveals that, without issuing citations, officers at least three times verbally warned the Thomases that the camping regulation prohibited their ongoing behavior (on the nights of February 28, March 21, and March 25). Additionally, officers issued four citations to the Thomases, each of which should have alerted the Thomases that the coincidence of circumstances that comprised their behavior brought them within the regulation. Also, a letter from the Park Service to another protester and that William Thomas introduced into evidence provides some evidence of actual notice (as opposed to, as the Thomases would have it, supporting their case). The letter, which was read into the record, states: "However, once casual sleeping become[s] overnight sleeping or sleeping for large portions of the night or day or is coupled with other indicia of

camping, then that conduct violates the camping regulation." (Tr. 163). This statement further defines the nature of the contextual reasoning and clearly encompasses both William Thomas's admitted "napping" during the ongoing vigil and the facts found by the trial court. Finally, a permit system allows the Thomases to obtain clear notice of what falls within the regulation, so long as they do not in practice add indicia of camping to those activities listed in their permit application. *See, e.g., Letter Carriers,* 413 U.S. at 580, 93 S.Ct. at 2897 (existence of procedure for determination of lawfulness of contemplated act reduces vagueness concerns). The existence of the actual notification—in warnings and citations, for example—confirms our conclusion that the Thomases had fair notice that the regulation applied to their contemplated conduct.

### 3

Apart from notice, the void for vagueness doctrine also seeks to ensure that officials do not possess undue discretion in their enforcement of the challenged enactment. In our view, the Thomases' case fails to raise that danger sufficiently to warrant a conclusion that the regulation is vague as applied. They present no evidence of discriminatory enforcement. *Cf. CCNV,* 468 U.S. at 295 & n. 6, 104 S.Ct. at 3069 & n. 6. And nothing in the enforcement as against the Thomases suggests that the officials have usurped or arbitrarily employed (otherwise) lawful authority, evils against which the Clause is designed to guard. Rather, the officials have repeatedly made the contextual judgment that the regulation warrants.

More importantly, nothing in the terms of the regulation implicitly confers undue discretion upon Park Service officials. While officers on the enforcement frontlines are left with some ordinary discretion over what falls within the enactment, *see Grayned,* 408 U.S. at 114, 92 S.Ct. at 2302, they nonetheless must justify their action by the terms of the regulation. As we have discussed, *see supra* pp. 196–98, the concept of camping, once defined as "use

of park land for living accommodation purposes," in turn elucidated by specific indicia of that use, describes reasonably precise boundaries of the prohibited behavior. Those concepts, definitions, and indicia similarly contain and channel officials' enforcement discretion for purposes of the values secured by the Due Process Clause. *CCNV* implicitly confirmed this conclusion in upholding the regulation against a vagueness challenge. *See supra* pp. 195–196.

### C

Once we conclude, as we have, that the regulation provided fair notice to the Thomases and sufficiently delimited the discretion conferred upon enforcement officers, we are left, then, only with the puzzle of why the Thomases sought to discern the scope of the regulation yet repeatedly ran afoul of it. Without that puzzle, this case would have presented an easier question, and a shorter opinion. The record suggests that the Thomases have always believed that they have not over the years engaged in camping, in some Platonic or Eagle Scouts sense, and that they have in accord with their deeply held religious beliefs given up *all* accommodations. Therefore, as counsel put it at oral argument, the Thomases view themselves as having, in effect, *no* living accommodations. Nonetheless, the regulation and its enforcement, as applied to the Thomases, fairly and clearly told them the contrary; it therefore readily passes constitutional muster in its application to them. The Thomases persisted in effectuating their belief, which at day's end amounts to disagreement with the clear import of the regulation as indicated by its language, its enforcement, its interpretation by the district court, and now our reading. It may be unfortunate that the Thomases' deeply felt convictions have led them to persistent behavior running afoul of the clear import of the regulation. That disagreement, in the face of various warnings, perhaps reflects courage, conscience, or tragedy. It manifestly

does not reflect, in the regulation as it has been applied, vagueness of constitutional dimension.

\* \* \* \* \* \*

For the foregoing reasons, we reject the Thomases' challenge to the sufficiency of the substantial evidence arrayed against them and are constrained to conclude that their vagueness assault on the camping regulation, as applied to them, falls considerably short.

AFFIRMED.