UNITED STATES of America

v.

Carl F. MUSSER, Appellant.

UNITED STATES of America

v.

Carl F. MUSSER, Appellant.

Nos. 88–3006, 88–3007.

United States Court of Appeals,
District of Columbia Circuit.

Argued April 7, 1989.

Decided May 9, 1989.

Nina Kraut, Washington, D.C., (appointed by the court) for appellant.

R. Craig Lawrence, Asst. U.S. Atty., with whom Jay B. Stephens, U.S. Atty., and John D. Bates, Asst. U.S. Atty., were on the brief, Michael W. Farrell, Washington, D.C., for appellee.

Before RUTH B. GINSBURG, D.H. GINSBURG, and SENTELLE, Circuit Judges.

Opinion for the Court filed by Circuit Judge SENTELLE.

SENTELLE, Circuit Judge:

Carl Musser ("Musser" or "appellant") appeals from two judgments of conviction in non-jury trials for violations of 36 C.F.R. § 7.96(g)(5)(x)(B)(2) by having an unattended sign in Lafayette Park and § 7.96(i)(1) by camping in Lafayette Park. Appellant contends that the District Court erred in three respects: (1) by denying him a trial

by jury, especially as to the sign offense; (2) by not dismissing the information charging the sign offense for violation of his First Amendment rights; and (3) by denying his motion for judgment of acquittal as to the camping charge. As we find no basis for unsettling the judgments in any of these assignments, we affirm.

## I. BACKGROUND

The two charges against Musser arise from two incidents, unrelated except that they both occurred in a two-day time span at the same location. Therefore, we must set out the factual and regulatory background as to each separately.

### A. *The Sign Incident*

On March 24, 1987, appellant was in Lafayette Park participating in an on-going, round-the-clock antinuclear demonstration. As part of his participation in the demonstration, he possessed or "attended" a sign. 36 C.F.R. § 7.96(g)(5)(x)(B)(2) requires that persons with signs in Lafayette Park attend their signs at all times. The regulation defines "attend" as remaining within at least three feet of the sign.[1] United States Park Police Officer Robert Bradley Hewick arrived on the scene, found the sign "unattended," awaited the return of the owner of the sign, and arrested appellant when he returned to claim the sign. While the government's evidence and that of the defense differed as to the details of how far from the sign appellant actually was and when he returned, it is undisputed that he was more than three feet from the sign and remained so for the period of the Officer's observation, thirty seconds to a minute.

### B. *The Camping Incident*

The following day, March 25, 1987, the second incident occurred. While the evidence of the government and the appellant differ somewhat, we accept as true for purposes of this appeal the evidence of the government. *See* Part IIC, *infra.* Park Police Officer Daniel Mark DeLullo arrived at Lafayette Park at approximately 10:00 p.m. He observed Musser asleep on what he described as two wooden pallets. Musser lay on cloth material on top of the pallets under a yellow blanket covered with plastic over his entire body and had some sort of cloth material under his head as a pillow. Beside him were bags of "materials," leaflets, and two coffee cans. DeLullo approached Musser, shined his flashlight in his face, and spoke to him. When he received no response, and Musser did not open his eyes, he spoke to him again, still receiving no response, and finally tapped Musser's foot with his own. Musser then lifted his head and opened his eyes. The Officer told Musser that he was not allowed under camping regulations to sleep or camp in the Park and moved on, leaving Musser in a sitting position.

Approximately one hour later, at 11:00 p.m., the Officer returned to the same area of the Park and found Musser still lying on the pallets, his eyes closed, apparently asleep. The same belongings, blanket, and makeshift pillow were in the same positions as before. The Officer proceeded in the same sequence of flashlight shining, attempted verbal wake-up, and foot tapping as before. Again, the Officer warned Musser of the prohibition against sleeping or camping and this time warned him not to go back to sleep. The Officer continued on patrol. When the Officer left the area, Musser was still lying down, but he was awake and his eyes were open.

A little over an hour later, at approximately ten minutes after midnight on

1. The relevant text of the regulation specifies:
 (x) The following are prohibited in Lafayette Park:

 . . . . .

 (B) The use of signs except for the following:

 . . . . .

 (2) Signs that are not being hand-carried and that are no larger than four (4) feet in length, four (4) feet in width and one-quarter (¼) inch in thickness ... may be used in Lafayette Park ... *provided further that* such signs must be attended at all times (the term "attended" is defined as an individual being within three (3) feet of his or her sign(s)).... 36 C.F.R. § 7.96(g)(5)(x)(B)(2) (1987) (emphasis in original).

March 26, the Officer returned and found the scene unchanged and the appellant again asleep. This time he took him by the shoulder, shook him awake, advised him he was in violation of the Code of Federal Regulations, and issued a violation notice.

## II. ANALYSIS

While none of appellant's assignments of error warrants disturbing appellant's convictions, each occasions some brief separate discussion.

### A. *The Right to Jury Trial*

■ Appellant contends that he was wrongly denied a trial by jury, at least as to the unattended sign offense.[2] The maximum authorized sentence for violating the sign regulation is a $500 fine and/or six months imprisonment. 36 C.F.R. § 1.3(a) (1987). This classifies the offense as a "petty offense" under 18 U.S.C. § 1(3) (1982), the applicable section at the time of the two offenses,[3] which states in relevant part:

Any misdemeanor, the penalty for which ... does not exceed imprisonment for a period of six months or a fine of not more than $5,000 for an individual ..., or both, is a petty offense.

"It has long been settled 'that there is a category of petty crimes or offenses which is not subject to the Sixth Amendment jury trial provision.'" *Blanton v. City of North Las Vegas*, —— U.S. ——, ——, 109 S.Ct. 1289, 1291, 103 L.Ed.2d 550 (1989) (quoting *Duncan v. Louisiana*, 391 U.S. 145, 159, 88 S.Ct. 1444, 1453, 20 L.Ed.2d 491 (1968)). While the Supreme Court has employed differing indicia as to whether or not an offense evinces sufficient gravity to invoke the Sixth Amendment right to jury trial, in *Duncan v. Louisiana*, the Supreme Court recognized that "[c]rimes carrying possible penalties up to six months do not require a jury trial if they otherwise qualify as petty offenses." 391 U.S. at 159, 88 S.Ct. at 1453 (citing *Cheff v. Schnackenberg*, 384 U.S. 373, 86 S.Ct. 1523, 16 L.Ed.2d 629 (1966)). Appellant initially argued that "special circumstances" are present which should cause us to determine that this offense ought not to be considered petty. This argument was based in large part on *United States v. Thomas*, 574 F.Supp. 197 (D.D.C.1983), in which a district judge considered the right to jury trial of a protestor on the White House sidewalk charged with violating an Interior Department regulation by his use of a symbolic cardboard object the size and shape of a Pershing Missile; the government alleged that the object was a "structure," displayed in violation of 36 C.F.R. § 50.19(e)(A)(i), which forbids structures at that site. That judge held that a defendant is entitled to "a jury trial when the maximum sentence would be six months or less if other special circumstances are present such that the crime would not be considered petty." 574 F.Supp. at 198. He further held that there was such a "special circumstance in [that] case because of its First Amendment implications." *Id.* He reasoned that, if the factfinder ruled against the defendant on elements of the offense related to his symbolic speech, the "decision could have a chilling effect on a

---

**2.** Appellant's brief speaks in terms of both offenses, but he made no demand for jury trial below as to the camping offense and substantially abandoned that claim at oral argument before this Court.

**3.** In subsequent revisions to Title 18, Congress redefined "petty offense."

As used in this title, the term "petty offense" means a Class B misdemeanor, a Class C misdemeanor, or an infraction, for which the maximum fine is no greater than the amount set forth for such an offense in [18 U.S.C. §] 3571(b)(6) or (7) in the case of an individual [i.e., $5,000] or [18 U.S.C. §] 3571(c)(6) or (7) in the case of an organization [i.e., $10,000].

18 U.S.C.A. § 19 (West Supp.1989). Section 1(3) remained effective until November 1, 1987, thereby including both offenses that are the subjects of this appeal. Nonetheless, the revisions, if applicable, would have had no substantive effect on the questions before us, as a Class B misdemeanor has a maximum authorized sentence of "not more than six months," a Class C misdemeanor has a maximum authorized sentence of "not more than thirty days," and an infraction has a maximum authorized sentence of "not more than five days." 18 U.S.C. § 3581(b)(7), (8) & (9) (Supp. V 1987).

variety of future protest activities by the defendants and others. This is a serious collateral effect, which may distinguish the crime charged ... from the petty." *Id.*

Appellant argues here that the District Court was correct in *Thomas* and that the same implications are present in his case so that the District Court here should have granted him a jury trial. While other district judges of the District of Columbia have ruled to the contrary (*see, e.g., United States v. Semple*, 661 F.Supp. 556 (D.D.C. 1987), and obviously the unreported decision of the trial judge in the present case), the *Thomas* decision was at least arguably justifiable when made in light of *District of Columbia v. Clawans*, 300 U.S. 617, 57 S.Ct. 660, 81 L.Ed. 843 (1937). In *Clawans*, the Supreme Court looked to factors outside the punishment to conclude that the defendant was entitled to a jury trial. However, since the decision in *United States v. Thomas*, and, indeed, after the trial in the present case and the filing of initial briefs in the present appeal, the Supreme Court has again spoken to the subject and clarified the delineation of charges not entitling defendants to jury trial. In the very recent case of *Blanton v. City of North Las Vegas, supra*, the defendant had been denied a jury trial for the offense of driving under the influence of alcohol, in violation of a Nevada statute punishable by a maximum term of six months imprisonment. Nev.Rev.Stat. § 484.379.1 (1987). He argued to the Supreme Court that additional consequences of the conviction, including loss of driver's license and required attendance, at his own expense, at an alcohol abuse education course, evidenced a legislative decision that the offense was of sufficient severity to escape classification as a petty offense and " 'puncture the 6–month incarceration line.' " —— U.S. at ——, 109 S.Ct. at 1293 (quoting Brief for Petitioner therein). However, a unanimous Supreme Court rejected that claim, holding that

> [a]lthough we did not hold in *Baldwin [v. New York*, 399 U.S. 66 [90 S.Ct. 1886, 26 L.Ed.2d 437] (1970),] that an offense carrying a maximum prison term of six months or less automatically qualifies as a "petty" offense, and decline to do so today, we do find it appropriate to presume for purposes of the Sixth Amendment that society views such an offense as "petty".

*Id.*

Musser's court-appointed counsel, commendable both for her diligence and her adherence to ethical standards of candor with the Court, noted the *Blanton* decision in Appellant's Reply Brief. She argued, in the Reply Brief and at oral argument, that in the present case the six-month incarceration line is punctured. Appellant's argument is that the "automatic inability of the defendant to exercise his fundamental guarantees under the First Amendment were he to be incarcerated subsequent to a conviction, should be" sufficient to require a jury trial. Appellant's Reply Brief at 3. We cannot agree. While *Blanton* holds that the six-month line is only presumptive and not conclusive, Justice Marshall's opinion for the unanimous Court made it plain that, where the maximum term of incarceration is for six months or less, "[a] defendant is entitled to jury trial ... only if he can demonstrate that any *additional statutory penalties*, viewed in conjunction with the maximum authorized period of incarceration, are so severe that they clearly reflect a legislative determination that the offense in question is a 'serious' one." *Blanton*, —— U.S. at ——, 109 S.Ct. at 1293 (emphasis supplied). The consequence raised by appellant does not constitute an additional statutory penalty. Appellant here, if incarcerated, is no more deprived of First Amendment rights than any other incarcerated defendant, whether his offense be using an unattended sign or driving under the influence. The First Amendment consequences, if any, of the charge are matters in defense. *See* Part IIB, *infra*. The right to jury trial under *Blanton* focuses on the charge and the sentence it carries, not matters in defense.

**B. *The First Amendment Claim***

 While the First Amendment implications of prosecution under the unattended sign provision of 36 C.F.R.

§ 71.96(g)(5)(x)(B)(2) do not bear on a defendant's right to jury trial, nonetheless, as we noted above, those implications are properly raised as matters in defense. Appellant, in his demonstration activity, was obviously engaged in expressive political activity at the core of values protected by the First Amendment. "Congress shall make no law ... abridging the freedom of speech ... or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances." U.S. Const. amend. I. "There is no doubt that as a general matter peaceful picketing and leafletting are expressive activities involving 'speech' protected by the First Amendment." *United States v. Grace,* 461 U.S. 171, 176, 103 S.Ct. 1702, 1706, 75 L.Ed. 2d 736 (1983) (citations omitted). It is also undisputed that Lafayette Park in which appellant was exercising his First Amendment rights is the type of public place traditionally associated with that exercise. "It is ... true that 'public places' historically associated with the free exercise of expressive ideas, such as streets, sidewalks, and *parks,* are considered, without more, to be 'public forums.'" *Id.* at 177, 103 S.Ct. at 1707 (emphasis supplied). *See also Perry Educ. Ass'n v. Perry Local Educators' Ass'n,* 460 U.S. 37, 45, 103 S.Ct. 948, 954, 74 L.Ed.2d 794 (1983); *Carey v. Brown,* 447 U.S. 455, 460, 100 S.Ct. 2286, 2290, 65 L.Ed.2d 263 (1980); *Cox v. New Hampshire,* 312 U.S. 569, 574, 61 S.Ct. 762, 765, 85 L.Ed. 1049 (1941). In public forums, the government may restrict the exercise of First Amendment rights to expression only through the enforcement of "reasonable time, place, and manner regulations ... 'narrowly tailored to serve a significant government interest, and leav[ing] open ample alternative channels of communication.'" *Grace,* 461 U.S. at 177, 103 S.Ct. at 1707 (quoting *Perry Educ. Ass'n,* 460 U.S. at 45, 103 S.Ct. at 955). Appellant contends that the "three feet" limitation in the present regulation bursts out of those limits and is not "narrowly tailored to serve a significant government interest."

In light of the important rights involved and the nature of the forum, we do not regard the claim as frivolous. Nonetheless, in the specific context of the present regulation and the facts of this case, we do find appellant's argument unpersuasive. Section 7.96(g)(5)(x)(B)(2) forbids the use in Lafayette Park of signs that are not handheld unless such signs are "attended" at all times. As we indicated in presenting the background of this offense, Part I, *supra,* the definition of "attended" requires "an individual being within three (3) feet of his or her sign(s)." 36 C.F.R. § 7.96(g)(5)(x)(B)(2). Appellant contends this limitation on the otherwise lawful use of signs in a First Amendment protected demonstration within a public forum is not sufficiently narrowly tailored to serve significant government interests and thereby survive constitutional scrutiny. However, as it happens, this Court has twice considered a similar regulation requiring signs to be attended when used on the White House sidewalk across the street from Lafayette Park. That regulation, 36 C.F.R. § 50.19(e)(9), required that signs be "attended" by being in actual "physical contact" with the responsible person.[4] In *White House Vigil v. Watt,* 717 F.2d 568, 572 (D.C.Cir.1983) (*"White House Vigil I"*), we considered a preliminary injunction restricting the enforcement of that and other regulations and expressly directed the redefinition of "attended" during the pendency of litigation over the validity of the regulations. We directed that "[t]o reduce ... uncertainty and the possibility of litigation about it, an 'attended' sign or placard should be defined objectively as one within three feet of the person responsible for controlling it." *Id.* at 572. Subsequently, we revisited the matter, after the District Court had struck down most of the regulations. *White House Vigil v. Clark,* 746 F.2d 1518 (D.C.Cir.1984) (*"White House Vigil II"*). Given the extreme sensitivity of the White House as "a unique situs for considerations of presidential and national

---

**4.** The regulation, retaining the "physical contact" requirement for attending a sign on the White House sidewalk, largely remains in force today, recodified at 36 C.F.R. § 7.96(g)(5)(viii) (1987).

security," *id.* at 1533, we expressly approved "the requirement that a demonstrator maintain physical contact with his or her sign" as a "means of ensuring that signs are not turned into weapons or used to conceal dangerous items." *Id.* at 1534.

While the public forum across the street from the White House may not be quite as sensitive a "situs" as the sidewalk immediately adjacent to that "unique situs," neither is the definition of "attended," paralleling as it does our direction in *White House Vigil I,* quite so tightly restrictive of the activity of the demonstrator as is the physical contact limitation expressly approved in *White House Vigil II.* Granted there might be legitimate disagreement as to whether the appropriate distance is three feet, five feet, one foot, or nine, but "[w]e are not at liberty ... to replace the agency's judgment with our own. It is sufficient that the means selected be 'narrowly tailored': that they lie within the range of feasible options the agency was constitutionally permitted to consider." 746 F.2d at 1534. As Judge Wald noted in her separate opinion in *White House Vigil II,* "unattended signs create an opportunity for others to place explosives in or under them." 746 F.2d at 1550 (Wald, J., dissenting in part). As she further noted, a less restrictive regulation "might work well most of the time, but serious harm could be threatened where a large crowd ... made it impossible to identify a sign owner within five feet." *Id.* The "within three feet" definition of attended, chosen by the agency in the present regulation, appears sufficiently narrowly tailored to meet these interests to prevent our second guessing or "fine tuning" the agency's resolution of the competing security and First Amendment interests involved, and it does not appear to unduly burden the ability of appellant or other demonstrators to engage in protected First Amendment activity. We, therefore, grant no relief on this constitutional claim.

C. *The Camping Case*

 Finally, appellant contends that the evidence was not sufficient to support his conviction of violating the camping regulation. That regulation, 36 C.F.R. § 7.96(i)(1) (1987), defines camping as

> the use of park land for living accommodation purposes such as sleeping activities, or making preparations to sleep (including the laying down of bedding for the purpose of sleeping), or storing personal belongings, or making any fire, or using any tents or shelter or other structure or vehicle for sleeping or doing any digging or earth breaking or carrying on cooking activities. The above-listed activities constitute camping when it reasonably appears, in light of all the circumstances, that the participants, in conducting these activities, are in fact using the area as a living accommodation regardless of the intent of the participants or the nature of any other activities in which they may also be engaging.

*Id.*[5]

Appellant points to the legislative history of the regulation as plainly revealing that "[s]hort-time, casual sleeping which does not occur in the context of using the park for living accommodations will not be affected by these regulations." 47 Fed.Reg. 24,299, 24,301 (1982). Appellant contends that the government's evidence in the instant case proves at most casual sleeping. In appellant's view, all the government proved was a two-hour snooze.

In addressing the distinction between casual sleeping and "sleeping activities" sufficient to make it "reasonably appear[ ], in light of all the circumstances, that the participants, in conducting these activities, are in fact using the area as a living accommodation," we are informed by our opinion in *United States v. Thomas,* 864 F.2d 188 (D.C.Cir.1988). In that case, we upheld a conviction for violation of this same regulation based on evidence that the defendants had lain " 'on top and within bedding materials throughout the night, for a one-week period, without evidence of any other sleeping quarters,' " *id.* at 190–91 (quoting Memorandum Opinion, *United States v.*

---

5. The constitutionality of these camping regulations in general was upheld in *Clark v. Community for Creative Non–Violence,* 468 U.S. 288, 104 S.Ct. 3065, 82 L.Ed.2d 221 (1984).

*Thomas,* Crim. No. 87–0231 at 17 (D.D.C. Feb. 5, 1988)), "surrounded by minor items of property and their literature, which was covered by plastic." 864 F.2d at 191–92.

Certainly, a principal item of evidence of intent to use the Park for living accommodations present in *Thomas* is absent here. The evidence in *Thomas* showed that the defendants there used the Park for living accommodations for an entire week. The events in the present case all took place within a single night. But the camping regulation is not limited to long-term living accommodations. Overnight camping is as forbidden as is week-long or longer camping. Therefore, our review in the present case will be directed toward determining whether or not the evidence was sufficient to support a conclusion, beyond a reasonable doubt, that it reasonably appeared that Musser was in fact using the Park as his living accommodations for a single night. It was.

As we noted in *Thomas,* "[t]he standard governing our review is well settled and understood. On appeal, a reviewing court is to accord a guilty verdict great deference; indeed, the sole evidentiary issue in such instances is whether substantial evidence supports the verdict." *Id.* at 191. Otherwise put, "[o]ur task ... is to view the evidence in the light most favorable to the government, allowing the government the benefit of all reasonable inferences that may be drawn from the evidence, and permitting the [factfinder] to determine the weight and credibility of the evidence." *United States v. Sutton,* 801 F.2d 1346, 1358 (D.C.Cir.1986). Viewing the evidence in the light most favorable to the government, a reasonable factfinder could certainly be convinced beyond a reasonable doubt that a person stretched out on a wooden pallet with bedding material under him and over him, covered by plastic, a makeshift pillow under his head, and his belongings around him, asleep for at least two hours, appeared to be using the Park for at least temporary living accommodations. Though he may have broken no ground and started no fires, like an archetypical boy scout or backpacker, he appeared to be camping overnight—or at least a reasonable factfinder could so find. Unlike the law-abiding boy scout or backpacker, he was not doing his camping in an area where that activity is lawfully permitted.

While the District Court's finding as to "sleeping" was only a general one arguably as consistent with casual sleeping as with the kind of "sleeping activity" contemplated in the regulation, he additionally found "camping" as such. More importantly, since no party requested the Court to find the facts specifically as defendant could have done under Rule 23(c) of the Federal Rules of Criminal Procedure, special findings were waived. "On appeal, findings will be implied in support of the judgment if the evidence, viewed in a light most favorable to the government, warrants them." *United States v. Ochoa,* 526 F.2d 1278, 1282 n. 6 (5th Cir.1976). *See also McClain v. United States,* 417 F.2d 489, 492 (9th Cir.1969); 8A Moore's Federal Practice ¶ 23.05[2] (2d ed. 1989). Therefore, this conviction must stand.

### III. CONCLUSION

For the reasons above stated, we find insubstantial on this record and the governing law appellant's contention of reversible error. Therefore, the judgment of conviction as to both counts is affirmed.

*It is so ordered.*