
William THOMAS, Appellant,

v.

UNITED STATES, Appellee.

No. 84–1728.

District of Columbia Court of Appeals.

Argued Nov. 21, 1988.
Decided April 19, 1989.

· Bruce Clarke, Public Defender Service, with whom James Klein, Public Defender Service, and Jennifer P. Lyman, Washington, D.C., Public Defender Service, were on the brief, for appellant.

Ann K.H. Simon, Asst. U.S. Atty., with whom Jay B. Stephens, U.S. Atty., and Michael W. Farrell, Mary Ellen Abrecht, and Zinora M. Mitchell, Asst. U.S. Attys., Washington, D.C., were on the brief, for appellee.

Before ROGERS, Chief Judge, and BELSON and SCHWELB, Associate Judges.

SCHWELB, Associate Judge:

William Thomas appeals from his conviction by a jury of malicious destruction of property (felony) in violation of D.C.Code § 22–403 (1981). He contends that the

prosecutor misstated the applicable law to the jury, that the trial judge did not take adequate steps to correct the prosecutor's misstatements, and that as a consequence he (Thomas) was denied his right to a fair trial. Although the case is a close one, and although Thomas quite appropriately complimented the judge on his fairness, we agree with just enough of Thomas' argument to compel us to reverse his conviction and remand the case for a new trial.

I

Those who demonstrate in support of peace and justice often light candles in symbolic protest against war and oppression and in memory of those victims of violence who have perished. This is a case of a demonstrator whose ostensibly symbolic torching of his own protest sign or structure in front of the Old Executive Office Building (OEOB) set off a spectacular mini-conflagration, which spread to the OEOB fence and scorched and substantially damaged a granite column. The issue before the jury was whether Thomas had acted with malice in setting his contraption on fire and was therefore criminally responsible for the damage to the column.

Much of the evidence at trial was undisputed. Since June 1981, Thomas had been maintaining a vigil in front of the White House, expressing his opposition to nuclear weapons and mendacious politicians.[1] During the period of his vigil, the regulations governing the display of signs and structures in front of the White House had frequently changed. Thomas testified that he had attempted to accommodate the various revisions in the regulations in order to ensure that his protest remained lawful. He claimed that he had been repeatedly arrested, beaten, harassed and otherwise mistreated by the police in retaliation for his activities.

In early 1983, Thomas and fellow-participants in the vigil were using three large wooden protest signs or structures[2] to bring their message to the public. Each of these contraptions consisted of several painted plywood panels attached to wooden frames mounted on wheels. The sign which Thomas ultimately set on fire depicted a flaming mushroom-like cloud on the front, with the words:

REVELATION

THIS NEED NOT

BE OUR END

IT'S UP TO YOU

appearing in the boldest letters on the (presumably) nuclear mushroom. In smaller lettering on the left side of the sign, there appeared, perhaps ironically in retrospect, the following quotation from the Book of Revelation:

The false prophet makes fire come down from heaven in the sight of men.

On March 11, 1983, Thomas and his fellow-demonstrators were advised by representatives of the federal and District of Columbia governments that they would have to remove their demonstration paraphernalia. United States Park Police officials, who were accompanied by two attorneys from the Department of the Interior, advised the group that the applicable regulations forbade the placement of "structures" such as those used by the demonstrators on the White House sidewalk. Representatives of the Metropolitan Police

1. For an eminently readable description of other aspects of Thomas' protest, see Judge Starr's recent opinion for the court in *United States v. Thomas,* 274 U.S.App.D.C. 385, 864 F.2d 188 (1988).

2. The transcript of the trial is replete with the ceaseless but in our view fruitless attempts of both sides to score debating points by self-serving characterizations of these objects. The prosecutor and her witnesses called them "devices" or "structures." The defense attorney and the defendant called them "signs." To simplify the dialogue, we refer to the contraption that was set aflame—the Revelation sign or structure—simply as Revelation.

Department (MPD) told Thomas that he could not leave the contraptions in front of the OEOB, or anywhere else on public property in the District, because they constituted "living abodes."[3] Thomas was warned that he would be subject to arrest if he failed to remove the allegedly offending entities.

Thomas initially remonstrated with the officials, challenging the legal basis for their actions.[4] He contended that the activities now being prohibited had been permitted for several months and that the "signs" were neither "structures" nor "abodes." Admittedly frustrated and disappointed when he made no headway with his arguments, he indicated that something "big" was about to happen. In a way, it did.

An hour or more after these discussions, Thomas set fire to Revelation from inside by pouring some kerosene on the floor and lighting it with a cigarette lighter. He then came out and began to address the law enforcement officials gathered outside. As he recalled on the stand, he told the group:

> I'm tired of this shit. You people are a bunch of hypocrites. You claim to be concerned with protecting freedom and individual rights and yet you are constantly harassing me, trying to prevent me from speaking my mind.

He would have said more, but one of the officers noticed what had happened and stated "Look, it's on fire." A second officer yelled "Arson! Arson! Arrest him!" Thomas related that he fell to the ground and went limp, in conformity with the teachings of Gandhi, Martin Luther King and Jesus. The officers squatted on his back and handcuffed him while he yelled

> Democracy is dead! Long live the police state!

The fire continued to burn. The officers could not or did not do anything to stop it until fire fighters arrived. Color photographs which were admitted into evidence, each one of which is worth at least a thousand words, show the vividly orange, yellow and brown flames rising many feet into the air, initially forming a bizarre contrast to the multi-colored mushroom design on Revelation, which design was then just below the flames. Eventually, only the metal frame and the cinders remained, and the top of the marble column was peeling, cracked and badly discolored.[5]

Explaining his actions on the witness stand, Thomas denied any malicious intent. He acknowledged that he had deliberately set Revelation aflame, but stated that he had expected the fire to last a short time and that only the sign would burn or be damaged. He related that he had some experience as a stone carver and that, based on his experience, he had been fairly certain that the column would not be damaged and was very surprised when the contrary occurred. Thomas admitted that he was "frustrated" when he set the fire, but denied being angry, stating that his act was "a product of my logical reasoning."

Thomas was cross-examined in some detail as to whether he had shown any concern about the consequences, to other persons and to property, of setting the fire. He acknowledged that he had not looked to determine if there were persons nearby, but explained that pedestrians usually walked forty feet away, and that they would, in any event, be able to observe the flames. With respect to the possibility of property damage, Thomas testified that he had affirmatively considered the question:

> I looked around and I thought, what will this fire damage, and I looked at the

---

3. It appears that Thomas sometimes slept in one or more of the contraptions.

4. Thomas testified, for example, that Captain Canfield of the MPD told him that if he did not remove the signs or structures he would be arrested for vagrancy. Thomas pointed out, correctly, that the District has no valid vagrancy law. *See Ricks v. District of Columbia*, 134 U.S.App.D.C. 201, 414 F.2d 1097 (1968).

5. The White House marble mason testified in some detail with respect to the damage done by the fire to the column. An official of the General Services Administration related that the repairs cost the government $2,260 in materials and $600 in labor.

stone wall and I said, "It's not going to damage the stone wall," and I looked at the metal fence, and I said, "It's not going to damage the metal fence," and I said, "Well, I can set it on fire without doing any damage to anything."

He admitted that he knew that Revelation was next to the column and that he did not move it away before setting it on fire. He also acknowledged that it was reasonable to believe that, where an object is set on fire next to another object, the flames will at least touch the second object.

## II

The issue on this appeal arises from the prosecutor's having told the jury, both as part of her initial closing argument and in rebuttal,

1. that the issue in the case was whether the damage to the column was reasonably foreseeable, using a "reasonable person" standard, and

2. that Thomas' testimony that he was surprised that the damage occurred was "not at all important or relevant to the issue of malice."

In order to assess the impact of these comments by the prosecutor, we must analyze both the legal context in which they were made and the part which they played in the trial as a whole.

### A. *The Legal Context*

D.C.Code § 22–403 (1981) provides in substance that whoever maliciously, by fire or otherwise, injures or destroys any public or private property not his own of the value of $200 or more shall be guilty of a felony. In the leading case of *Charles v. United States*, 371 A.2d 404 (D.C.1977), this court discussed the meaning of malice in the context of this statute, and held, among other things,

1. that malice may be inferred from intentional wrongdoing;

2. that the wrongdoing must be accompanied by a bad or evil purpose; and

3. that malice would not be shown if the injury were merely the result of negligence or accident.

*Id.* at 411. The court adopted the following definition of malice from Perkins, CRIMINAL LAW 769–70 (2d ed. 1969):

[M]alice in the legal sense imports (1) the absence of all elements of justification, excuse or recognized mitigation, and (2) the presence of *either* (a) an actual intent to cause the particular harm which is produced or harm of the same general nature, *or* (b) the wanton and willful doing of an act *with awareness of a plain and strong likelihood that such harm may result.*

*Id.*[6] (Emphasis added).

In *Carter v. United States*, 531 A.2d 956, 963 (D.C.1987), this court rejected the contention that "the malice involved in malicious destruction of property is somehow different from that malice which must be proven in murder cases." We agree with Judge Leventhal's observation, made in the context of determining whether a homicide is murder or manslaughter but equally applicable here, that "the difference between that recklessness which displays depravity and such extreme and wanton disregard for human life as to constitute 'malice' and that recklessness that amounts only to manslaughter lies in the quality of the awareness of the risk." *United States v. Dixon*, 135 U.S.App.D.C. 401, 405–06, 419 F.2d 288, 292–93 (1969) (concurring opinion). As this court put it in *United States v. Bradford*, 344 A.2d 208, 215 n. 22 (D.C. 1975):

In terms of the actor's awareness of risk to life, if he is aware of the risk, the

6. The court also observed that
[t]he basically awkward terms such as a "wicked heart" or a "bad or evil purpose" should not be overemphasized; a finding that the accused intended the actual harm which resulted from his wrongful act is not an essential prerequisite to the existence of malice. All that is required is a conscious disregard of a known and substantial risk of the harm which the statute is intended to prevent. *Id.*

crime is murder and not involuntary manslaughter. If he is not aware, implied malice is not a factor, and he should have been aware, the crime is involuntary manslaughter.

■■■ We conclude on the basis of these authorities that the ultimate issue in the present case is Thomas' subjective state of mind, rather than whether the harm would have been foreseen by a reasonable person. This does not mean, of course, that what a reasonable person would have expected to happen is irrelevant. On the contrary, absent an admission of the proscribed intent,[7] a showing that a reasonable person would have been aware of a risk is often the best available evidence that the defendant was aware of it.[8] While foreseeability of the harm to a reasonable person is relevant to the ultimate issue of guilt or innocence, the prosecutor must further show, in order to prevail, that the defendant was subjectively aware of the risk in question.

By the same token, Thomas' testimony that he thought he could set Revelation afire without risk to the column is certainly not determinative. Jurors may (and often do) disbelieve a defendant and convict him despite his denial that he entertained the forbidden state of mind. Contrary to the prosecutor's argument here, however, this does not render the defendant's testimony about what he knew or believed or intended irrelevant or even unimportant. A correct statement of the law is that the defendant's testimony on this subject is relevant and must be considered by the jury, but that it is to be evaluated like any other evidence and is not conclusive.

### B. *The Sequence at Trial*

It is not disputed that the trial judge's instructions to the jury with respect to

malice were consistent with the controlling case law. The question is whether the judge did enough to ensure that the prosecutor's incorrect statement of the law would not mislead the jury.

On three separate occasions—first in his introductory remarks to the jury, next in his final instructions, and finally in response to a jury note during deliberations —the trial judge instructed the jurors in conformity with Criminal Jury Instructions for the District of Columbia, No. 4.43 (3d ed. 1978). He told them that the government must prove beyond a reasonable doubt (in addition to the other elements of the offense) that

> the defendant acted maliciously, that is, with intent to injure or destroy the property, for a bad or evil purpose, and not merely negligently or accidentally.

> An act is done maliciously where it is done on purpose, without adequate provocation, justification or excuse, and has as its foreseeable consequence damage to or destruction of the property. Malice may be inferred from intentional wrongdoing, accompanied by a bad or evil purpose. It is not necessary that the defendant have intended any actual harm which you may find to have resulted from the act[s] with which he is charged; it is only necessary that you find he acted with a *conscious disregard of a known and substantial risk of harm* which the law intended to prevent.

(Emphasis added). The italicized language, reasonably construed, focuses on the defendant's subjective state of mind—he must *consciously* disregard the risk—and not on that of a hypothetical reasonable person.

After both parties had rested, and prior to closing argument, the judge met outside

---

7. Such an admission is rarely obtained, and a defendant's awareness of a particular fact or risk is therefore seldom capable of direct proof and must generally be inferred, if at all, from circumstantial evidence. *Charles, supra,* 371 A.2d at 410.

8. As the court explained in *Nestlerode v. United States,* 74 U.S.App.D.C. 276, 279, 122 F.2d 56, 59 (1941):

> Precisely what happened is what might have been expected as the result of the events which appellant set in operation and is the natural and probable consequence of these acts. Malice is presumed under such conditions.

*Accord, (William) Powell v. United States,* 485 A.2d 596, 600 (D.C.1984) (quoting from *Nestlerode* ), *cert. denied,* 474 U.S. 981, 106 S.Ct. 420, 88 L.Ed.2d 339 (1985).

the presence of the jury with counsel to preview his instructions. There was also some discussion of what would be permitted in closing argument.[9] There was no mention, however, of the question whether the government would be allowed to argue a "reasonable person" standard or that Thomas' subjective expectations were irrelevant. As a consequence, when the prosecutor made the arguments to the jury which triggered this appeal, she had neither sought nor secured the court's permission to do so.[10]

Much of the prosecutor's closing argument was entirely appropriate. She told the jury that the issue in the case was whether Thomas had acted with malice, and that the court would instruct the jurors in detail on that issue after counsel had completed their arguments. She explained correctly that

what is important is that [Thomas] acted with willful and deliberate disregard for a known risk and that the damage to the property was reasonably foreseeable.

She also argued that

What is relevant is that if something is set on fire that is right next to something else, it is, indeed, foreseeable that that something else is going to be touched and damaged by the flames. It cannot be denied.

[Defense counsel] said to you that Mr. Thomas is an intelligent man. You saw that on the stand. And for him to suggest that that [damage] was not foreseeable does not comport at all with what we've seen here. An intelligent person knows that that conduct would result in damage under the circumstances.

All of the above was, in our view, entirely legitimate.

Towards the end of her argument, however, the prosecutor crossed the line from the permissible—reasonable foreseeability of harm is evidence of malice—to the proscribed—malice is determined by what a reasonable person would have anticipated. Her contention to this effect prompted a defense objection, with respect to which the judge deferred ruling:

[The prosecutor]: We use a reasonable man standard, a reasonable person standard, when we look at what is reasonably foreseeable. . . .

We know that he deliberately set that structure on fire. He did it to prove a point. The question then becomes whether or not by that act, the damage to the column was reasonably foreseeable. The government submits that in using a reasonable person standard that the only conclusion that one can reach based on the evidence is that it was, indeed, reasonably foreseeable that Mr. Thomas—

[Defense counsel]: Your Honor, there is nowhere in the instruction where reasonably foreseeable is the concept—

The Court: [Defense counsel], save your comments until the end of the closing argument.

After thanking the court, the prosecutor ventured into an even more dangerous area.

Mr. Thomas said to you that he was surprised that the flames reached the level that they reached. He was surprised that the column was damaged.

---

9. The prosecutor attempted unsuccessfully to persuade the judge not to permit the defense attorney to argue for a defense of provocation based on alleged unlawful conduct by law enforcement officials directed against Thomas.

10. As the court stated in *United States v. Sawyer,* 143 U.S.App.D.C. 297, 299 n. 11, 443 F.2d 712, 714 n. 11 (1971):

Before stating a legal principle, counsel should be sure that it will in fact be included in the charge. If there is any question about the accuracy or relevance of counsel's pro-

posed statement of law, he should seek a ruling on the point before going forward with the argument.

The prosecutor was on notice that this rule was in effect in Judge Graae's court. During the defense attorney's opening statement, the prosecutor objected on the ground that counsel was discussing proposed evidence that would be inadmissible. In sustaining the objection, the judge ruled that defense counsel had "run afoul of the fact that we have not yet had an opportunity to make a ruling on it."

*That is not at all important or relevant to the issue of malice.*

(Emphasis added.)

Shortly thereafter, the prosecutor completed her argument, counsel for Thomas renewed his objection, and the following colloquy ensued:

> [Defense counsel]: There is absolutely no language in the instruction about "reasonable." [The prosecutor] is throwing that in there and telling the court what the law is.
>
> The Court: True, there isn't.
>
> [Defense counsel]: I would ask the Court to strike it.
>
> The Court: I will.
>
> \* \* \*
>
> [The prosecutor]: ... [T]he case law in the case, we're talking about reasonable foreseeability. That's not a misstatement of what the term means. I think if the Court, as the Court has done, reads the cases, we're talking about reasonable foreseeability.
>
> The Court: You're not talking about reasonably [foreseen] in this circumstance here. Really what I would like to do is, I will instruct the jury right now, of course, the attorney's statements of the law are not evidence and they really should be paying attention to the instructions I gave them as to what the law is. Mr. [Defense counsel], that's what I'm going to do.
>
> [Defense counsel]: I'd rather not have my argument prefaced by [sic] not listening to what I have to say about the law.
>
> The Court: You don't want the instruction then?
>
> [Defense counsel]: No, Your Honor.

No further mention was made by anyone of the original motion to strike, or of the judge's initial readiness to grant it.

Defense counsel then began his own closing argument by predicting, accurately, that the judge's instructions as to the law would not coincide with the prosecutor's legal theory. After asking the jurors to be sure to follow the judge's instructions, counsel continued:

> When you listen and hear the Judge talk about what is foreseeable consequences, listen to see if he says anything about reasonable man; he will not. What you're going to be hearing about in the instructions and what this case is about is what Mr. Thomas was thinking on March 11, 1983.[11]

In her rebuttal argument, the prosecutor again mixed entirely appropriate argument with a more dubious passage:

> Now, I told you before and I will tell you again that the fact that Mr. Thomas did not understand or did not know based on his experience that stone burns and in this case, granite, which you heard explodes when fire touches it, is not at all relevant to the question of foreseeability.... An intelligent person knows that the contact would result in damage under the circumstances.[12]

Following argument, as previously noted, the judge's instruction as to malice was taken directly from Instruction 4.43, and thus bore out defense counsel's prediction that there would be no mention of a reasonable person test. The judge also instructed the jurors, both in his opening remarks and in his charge, that "it is your duty to accept the law as I state it to you." At no time, however, did the judge explicitly address, in terms readily understandable by lay jurors, the question whether the line of argument by the prosecutor which he had earlier agreed to strike was right or wrong. In particular, he never dealt, at least explicit-

---

11. Prejudice from a misstatement by the prosecutor may be dissipated when defense counsel corrects it and the judge bears him out. *See Cross v. United States,* 122 U.S.App.D.C. 283, 285, 353 F.2d 454, 456 (1965).

12. Although, if considered alone, this passage might be susceptible of the more charitable con-

struction suggested by Judge Belson in his dissent, we think that the prosecutor's arguments in her initial closing and her remarks in rebuttal are in harmony with one another. When considered together, they plainly cross into the forbidden territory.

ly, with the prosecutor's assertion that Thomas' stated surprise that the column was damaged, and his professed belief that it would not be, were irrelevant. The jurors may have deduced the correct answer from the judge's omission of the reasonable person test from his instructions. It is also possible, however, that they did not.

## III

In *Gaither v. United States*, 134 U.S. App.D.C. 154, 172, 413 F.2d 1061, 1079 (1969), the court stated:

> The applicable test for prejudice is whether we can say, "with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error."[13] The decisive factors are the closeness of the case, the centrality of the issue affected by the error, and the steps taken to mitigate the effects of the error.

*Id.* at 172, 413 F.2d at 1079. *Gaither* involved the prosecutor's misstatement of the facts, but the same principles apply where, as here, she has misstated the law. *(James) Powell v. United States*, 455 A.2d 405 (D.C.1982). We address the three *Gaither* factors in turn.

### A. *The Closeness of the Case*

We have no hesitation in concluding, especially after viewing the spectacular color photographs of Revelation burning, the kerosene-fed flames rising high and enveloping the immediately adjacent column, and the damage actually done, that the circumstantial evidence of malice in this case is very strong. The jury could reasonably find that Thomas was not only frustrated, as he readily acknowledged, but angry as well, and that his zeal to send a message by doing something "big" led him to incinerate Revelation with little or no regard for the consequences to the proper-

ty of others. An examination of the photographs makes it difficult to resist the conclusion that anyone of even modest intelligence *must* have known that the flames would at least singe and probably discolor and thus "injure" the column. The prosecutor scored some telling points during cross-examination on this issue. Thomas testified that he was a philosopher who acted in a logical fashion. His counsel in effect invited the jury to note his intelligence. The inference is strong that Thomas was a man of reasonable intelligence who must have known of the risk.

From another perspective, however, it is difficult to determine the strength of the case, because the result turns in large part on Thomas' credibility. The only issue was malice, an aspect of Thomas' state of mind. It was Thomas' testimony on that very subject, and specifically his insistence that he did not believe that the column was at risk, that the prosecutor characterized as irrelevant. It is difficult if not impossible to assess on a cold record whether Thomas' demeanor and manner of testifying would have led the jurors to a different result if the prosecutor had not told them that the most important part of his testimony was irrelevant, or if the judge had explicitly cleared up the point.

### B. *The Centrality of the Issue*

There can be no question that the prosecutor's incorrect characterization of the law went to the only real question in the case. The centrality of the issue to which the incorrect arguments were addressed constitutes the greatest difficulty, in our view, with the government's contention that any misstatement was harmless.

### C. *The Steps Taken in Mitigation*

As previously noted, the judge correctly instructed the jurors on three separate occasions as to the law of malice, and he also

---

**13.** The passage in quotation marks is from *Kotteakos v. United States*, 328 U.S. 750, 765, 66 S.Ct. 1239, 1248, 90 L.Ed. 1557 (1946).

told them that his instructions as to the law were controlling. Moreover, events unfolded rapidly after the initial objection to the prosecutor's argument, and the defense attorney—an able advocate during the trial as a whole—was not as assertive as he might have been at the critical time, never again pushing his motion to strike or requesting clarifying instructions, and never moving for a mistrial. From the perspective of the judge, who (unlike his appellate counterparts) did not have briefs or transcripts or extensive time for reflection or collegial consultation, the defense attorney's rejection of the judge's suggested resolution and his subsequent silence may understandably have indicated that counsel had abandoned the point.

Nevertheless, we conclude that, on the central issue of the case, the jury should have been told, when the prosecutor argued the "reasonable person" test and the defense objected, that the ultimate issue was *Thomas'* state of mind, and that what a reasonable man would have foreseen, while relevant as to what Thomas could have foreseen, was not conclusive. Indeed, the trial judge himself evidently agreed with this view, and expressed himself ready to strike the offending remarks. Whether he affirmatively changed his mind about doing so, or whether the point was accidentally abandoned after defense counsel declined a lesser remedy,[14] is not clear from the record. Moreover, assuming *arguendo* that defense counsel's challenge to the jury to listen to the judge's charge and compare it with the prosecutor's statement about the reasonable person standard, followed by a correct charge, cured that prosecutorial misstatement standing alone, *see Cross v. United States, supra*[15]—an issue we need not decide—we do not think that the prosecutor's related but more extreme legal theory (that Thomas' surprise that the column was damaged was irrelevant) was ever sufficiently countered by the court. In effect, this critically important and misleading proposition was left hanging. We also conclude, given the close connection in time and content between the prosecutor's assertion of the "reasonable person" standard and her contention that Thomas' professed "surprise is irrelevant," as well as the judge's direction to defer objections until the prosecutor had finished, that a "plain error" analysis should not be applied to the "surprise is irrelevant" issue despite defense counsel's failure to challenge those specific words. Indeed, we understood the prosecutor to acknowledge as much at oral argument.

 But even if one deems defense counsel's objection to have been too short-lived and too tentative, the conviction nevertheless cannot stand. In cases in which the danger of prejudice is substantial, "mild judicial action" in response to an improper argument by the prosecutor is insufficient. *King v. United States*, 125 U.S.App.D.C. 318, 331, 372 F.2d 383, 396 (1967). When counsel misstates the law, the better practice is for the court to intervene promptly and to correct the misstatement, especially where, as here, the judge has discouraged the interruption of closing argument by counsel. *See (Duane) Dyson v. United States*, 450 A.2d 432, 442 n. 9 (D.C.1982). An attempt to prejudice the jury should be condemned *sua sponte* by the trial court in the presence of the jury, *United States v. Jenkins*, 140 U.S.App. D.C. 392, 397, 436 F.2d 140, 145 (1970) (prosecutor called defendant a hoodlum), and we think that the same holds true where the prosecutor seriously misstates the law. The Supreme Court has recently emphasized the importance of prompt and decisive action by the trial judge where

---

**14.** We think it reasonable to infer from the sequence of events that defense counsel construed the judge's switch to the lesser remedy as an effective denial of the motion to strike, and thought it futile to raise the subject again.

**15.** Since defense counsel maintained that his client was an intelligent man, the "reasonable person" standard as applied to Thomas had an evidentiary basis. If Thomas was reasonably intelligent, then arguably there was no difference between what he could foresee and what a reasonably intelligent person could foresee.

counsel has made an improper argument to the jury. *United States v. Young*, 470 U.S. 1, 9, 105 S.Ct. 1038, 1043, 84 L.Ed.2d 1 (1985). So have we. *Hammill v. United States*, 498 A.2d 551, 555 (D.C.1985); *Hawthorne v. United States*, 476 A.2d 164, 172 (D.C.1984).

■ In the present case, the prosecutor's misstatement went to the heart of the only real issue in the trial. Defense counsel objected, and after the judge initially indicated that he would take comparatively strong corrective action, he offered a less decisive remedy, which the defense declined. The result was that, aside from the standard "redbook" instructions, no corrective action was taken at all. Although the trial court has no general duty to instruct the jury *sua sponte, Allen v. United States*, 495 A.2d 1145, 1150 (D.C.1985) (*en banc*),[16] we hold that on these facts, in spite of defense counsel's relative passivity, the judge was obliged to counteract in some effective fashion the prosecutor's critical misstatement of the law.

## IV

■ It may very well be that the result of the trial would have been the same even if the prosecutor had not misstated the law, or if the judge had stricken or otherwise dealt more rigorously with her misstatements. We cannot say this with "fair as-

surance," *Kotteakos, supra*, however, and accordingly reverse Thomas' conviction and remand the case for a new trial.[17]

*So ordered.*

BELSON, Associate Judge, dissenting:

My differences with the majority opinion are narrow, but crucial to the outcome. They center upon the manner in which defense counsel participated in the phases of the trial upon which reversal is based. My conclusion is that in light of the way the defense tried this case, the trial court did not err.

To recount the salient facts, after defense counsel objected to the prosecutor's use of a reasonable person standard in her closing argument in chief, the trial judge at first responded to defense counsel's objection by expressing his readiness to strike the prosecutor's remarks, but after some colloquy indicated that he would instruct the jurors that attorneys' statements of the law are not evidence and would tell them to look to his final instructions on the issue. Defense counsel declined that relief and, most significantly, made no request whatsoever that the trial judge grant any different relief, not even the relief that was first offered.

When the prosecutor revisited the matter of foreseeability in the rebuttal argument,

---

16. *Cf. Carrado v. United States*, 93 U.S.App.D.C. 183, 193, 210 F.2d 712, 722 (1953), *cert. denied*, 347 U.S. 1018, 74 S.Ct. 874, 98 L.Ed. 1140 (1954): "It was the judge's duty to instruct the jury correctly, regardless of what theory any party might urge upon him in offering instructions."

17. There continues to be confusion in Criminal Jury Instruction 4.43 between the first sentence of the quotation on p. 1300, *supra*, which apparently requires an evil purpose, and the paragraph that follows, which does not. *See Charles, supra.* We suggest that the instruction be revised in conformity with the quotation from *Perkins* on p. 1299, *supra*, where it is stated that *either* a bad intent *or* wanton conduct with conscious awareness of the risk is required.

The trial judge also instructed the jury, in conformity with the first part of Criminal Jury Instruction 3.01, that "some criminal offenses

require only a general intent. And where this is so, and it is shown that a person has knowingly committed an act which the law makes a crime, intent may be inferred from the doing of the act." The judge never expressly stated that the criminal offenses to which this proposition applies include malicious destruction of property, but this was perhaps implicit.

There was no objection to this instruction, and we certainly do not hold that it was "plain error" to give it. We suggest, however, that even if "general intent" language can be theoretically reconciled with the concept of malice, it is more likely to confuse lay jurors than to enlighten them. An appropriate adaptation of Criminal Jury Instruction 3.02 (proof of intent), which the judge also gave, is of course entirely appropriate.

defense counsel made no objection.[1] Defense counsel never asked for a mistrial, nor did he ask the trial court to deal with any prosecutorial misstatement in the final jury instructions. On this record, I simply disagree that there was any trial court error that requires us to reverse appellant's conviction.

It is significant that there was nothing in the way the trial judge conducted the trial to discourage defense counsel from asking for any type of relief he wished to request. After the trial judge's initial proposal to strike the offending parts of the prosecutor's argument in chief had evolved into a different remedy, as I described above, defense counsel was entirely free to ask the trial judge to return to his first course of action. Instead, he ended the discussion by saying that he did not wish the instruction finally proposed by the judge. If defendant had preferred some alternate cure in order to remedy the prosecutor's apparently good-faith misstatement of the law regarding malice, it was incumbent upon defense counsel to ask for it. *See* ABA Criminal Standard 4–7.7(d) ("[T]he lawyer has a duty to have the record reflect adverse rulings or judicial conduct which the lawyer considers prejudicial to his or her client's legitimate interests."). Instead, after he declined the proffered relief, the defense counsel went through the rest of the trial without raising the matter again.

Defense counsel thereby gave every indication that he had made a tactical choice when he turned down the proffered relief.

Even if we posit that the prosecutor's misstatement of the law was so egregious that it normally would have required *sua sponte* intervention by the trial court, that does not dispose of this case. Here the matter was raised by counsel and dealt with by the court in a manner that evoked no indication of dissatisfaction from defense counsel. I respectfully dissent from a reversal of a judgment of conviction under these circumstances.

1. I add that I disagree with appellant and the majority that the challenged portion of the prosecutor's rebuttal argument contained an incorrect statement of law. The prosecutor said:

> Now, I told you before and I will tell you again that the fact that Mr. Thomas did not understand or did not know based on his experience that stone burns and in this case, granite, which you heard explodes when fire touches it, is not at all relevant to the question of foreseeability.
>
> What is relevant is that if something is set on fire that is right next to something else, it is, indeed, foreseeable that that something else is going to be touched and damaged by the flames. It cannot be denied.
>
> [Defense counsel] said to you that Mr. Thomas is an intelligent man. You saw that on the stand. And for him to suggest that that act was not foreseeable does not comport at all with what we've seen here. An intelligent

person knows that that conduct would result in damage under the circumstances.

It is important to note that the prosecutor was not referring to a *standard* of foreseeability but rather to the *question* of foreseeability. See majority opinion at 1299 *et seq.* It is not disputed that what a reasonable person would foresee was a relevant consideration on the issue of malice. See majority opinion at 1300. Moreover, the prosecutor's argument can be taken to mean that Thomas did not help himself by his assertion that he did not know that granite would burn or explode when fire engulfs it, because he knew at least that if fire was right next to something else, here granite, the something else in question was going to be "touched and damaged by the flames." If the defendant knew that there was going to be damage, *e.g.*, defacement of granite, it is not significant to the issue of malice that he was not aware of the extent of damage or the precise type of damage.