**Ophelia TARPEH, Appellant,**

v.

**UNITED STATES, Appellee.**

**No. 11–CF–145.**

District of Columbia Court of Appeals.

Argued Jan. 12, 2012.
Decided March 21, 2013.

---

**20.** See *supra* note 8.

Machen Jr., United States Attorney, Roy W. McLeese III, Assistant United States Attorney at the time the brief was filed, and Chrisellen R. Kolb, Demian S. Ahn, and Adam B. Schwartz, Assistant United States Attorneys, were on the brief, for appellee.

Before WASHINGTON, Chief Judge, FISHER, Associate Judge, and STEADMAN, Senior Judge.

WASHINGTON, Chief Judge:

Appellant Ophelia Tarpeh appeals from her conviction for criminal neglect of a vulnerable adult in violation of D.C.Code § 22–934 (2011 Supp.). Tarpeh contends that the record was insufficient to support her conviction. We agree, and reverse the conviction.

## I.

Appellant Ophelia Tarpeh was a certified nursing assistant ("CNA") for ten years and had been an employee of Leewood Healthcare Center, a nursing home located in Virginia, for two months at the time of the incident in question. Leewood is comprised of three nursing units: the Azalea unit for health care patients and those who require some assistance; the Dogwood unit for stroke patients and those who require great assistance; and the Star unit for Alzheimer's patients.

Tarpeh regularly worked in the Azalea unit, but on the morning of February 23, 2009, she was instructed to take Frances Young, a stroke patient and Dogwood unit resident of Leewood, to a dental appointment at the Washington Hospital Center ("WHC") in the District of Columbia. Tarpeh had never been asked before to transport a patient while employed at Leewood. It was also Tarpeh's first time traveling in the District of Columbia.

Emmanuel D. Akpan, with whom Ubong E. Akpan was on the brief, for appellant.

Shane N. Waller, Assistant United States Attorney, with whom Ronald C.

When Tarpeh arrived at the Dogwood unit, she found Young wrapped in a blanket and seated in a wheelchair, apparently ready to leave for her appointment. However, unbeknownst to Tarpeh, the wheelchair in which Young was seated did not have footrests, and Young, although covered in a blanket, was dressed underneath only in a tee-shirt and undergarments.[1] Young, who was overweight[2] and sixty-one years old at the time, was paralyzed on the right side of her body and could not speak.[3]

Tarpeh wheeled Young to a taxi waiting outside, and the driver assisted by putting Young, who remained seated in the wheelchair during the taxi ride, into the vehicle and locking the wheelchair into place. After an hour-long drive, the driver dropped Tarpeh and Young off at a hospital. But after entering the building, a nurse informed Tarpeh that she was at the Veterans Affairs Medical Center ("VA") instead of at the WHC where Young's appointment was scheduled. Upon being told by the VA nurse that the WHC was across the street,[4] and wanting Young to make her dental appointment, Tarpeh decided to wheel Young to the WHC.

Tarpeh did not have a clear idea of where she was going and became lost. She wheeled Young for several minutes eventually reaching a street corner when Young first screamed and moaned. Tarpeh locked the wheelchair to see what was going on, and saw that the blanket covering Young was caught under one of the tires of the wheelchair. Tarpeh also noticed that Young was wearing only socks but no shoes, and that there were no footrests on the wheelchair. Tarpeh removed the blanket from the wheel and tucked it underneath Young. At this point, however, Tarpeh could not wheel Young forward or backward without Young's foot dragging on the ground. In order to get her to the nearest hospital in sight, which was then the National Rehabilitation Hospital ("NRH"), Tarpeh slowly wheeled Young across the street.

Young soon moaned again and threw off the blanket into the street. Tarpeh saw that Young's foot was bent under the wheelchair. Tarpeh decided to continue pushing Young across the street toward the NRH, but Young, who weighed over 260 pounds, began to "slide off the chair." It took Tarpeh at least three minutes to navigate the distance between the street corner and the entrance to the NRH. During this time, Young's feet continued dragging across the pavement.

When Tarpeh arrived at the NRH, she was alone with Young.[5] Tarpeh stopped wheeling Young once they were inside the two double doors at the entrance of the NRH. Young was screaming and moaning, and her foot was bleeding profusely.[6] The

1. We take judicial notice of the weather on that day. It was cloudy and cold, with average temperatures in the low-thirties (degrees Fahrenheit). As the record indicates, Tarpeh had been wearing a coat that day over her uniform, and Young was covered in a blanket.

2. Young weighed over 260 pounds.

3. The record indicates that Young could answer questions "yes" or "no" by nodding or shaking her head.

4. These hospitals, along with the National Rehabilitation Hospital, are located on the same campus.

5. The trial court discredited the portion of Tarpeh's testimony in which she indicated that she had received assistance from two passers-by. As the government recognized at oral argument, the record is silent as to the level of traffic, pedestrian or otherwise, in this area on the day in question or generally.

6. As a stroke patient, Young regularly took an anticoagulant drug. Young suffered from oth-

events transpiring after the arrival at the hospital are fully set forth in the dissent.

Tarpeh was subsequently charged with misdemeanor criminal neglect of a vulnerable adult. A bench trial was held, and Tarpeh was found guilty. The trial court determined that Tarpeh was on notice that there was a problem at the street corner where Young first screamed and moaned. The trial court then found that Tarpeh's conduct, in pushing Young from the street corner to the NRH, despite the fact that she was aware that the wheelchair had no footrests and that Young's foot was dragging on the ground, constituted reckless indifference in violation of D.C.Code § 22–934. Tarpeh was sentenced to 180 days incarceration, execution of sentence suspended as to all but twelve days,[7] and one year supervised probation. She now appeals from this conviction.

## II.

▮▮▮ Appellant argues that there was insufficient evidence of reckless indifference to support her conviction for criminal neglect of a vulnerable adult under D.C.Code § 22–934. "In reviewing claims of insufficient evidence, we review the evidence in the light most favorable to the government, giving it the benefit of all reasonable inferences in its favor." *Stroman v. United States*, 878 A.2d 1241, 1244 (D.C.2005). "The government must present at least some probative evidence on each of the essential elements of the crime." *Mattete v. United States*, 902 A.2d 113, 115 (D.C.2006). "[I]n reviewing bench trials, this court will not reverse unless an appellant has established that the trial court's factual findings are plainly wrong or without evidence to support [them]." *Id.* (internal quotation marks omitted). We thus take the facts as found by the trial court. The question of whether appellant acted with reckless indifference is a mixed question of law and fact. *See Duggan v. District of Columbia*, 783 A.2d 563, 569 (D.C.2001), *amended and reinstated on reh'g en banc*, 884 A.2d 661 (D.C.2005); *In re Romansky*, 938 A.2d 733, 740 (D.C.2007).

To establish guilt of criminal neglect of a vulnerable adult,[8] the government must prove, beyond a reasonable doubt, that the defendant:

> knowingly, willfully or through a wanton, reckless or willful indifference fail[ed] to discharge a duty to provide care and services necessary to maintain the physical and mental health of a vulnerable adult, including but not limited to providing adequate food, clothing, medicine, shelter, supervision and medical services, that a reasonable person would deem essential for the well-being of the vulnerable adult....

D.C.Code § 22–934 (2001).

A review of the legislative history of the Criminal Abuse and Neglect of Vulnerable Adults Act ("the Act") reveals the type of conduct that the D.C. Council sought to penalize when it enacted this law. Recognizing the "tremendous increase in elder abuse," the Council identified the need to establish criminal penalties "for [the] abuse or neglect of vulnerable adults," and to "send a message that such abuse will

---

er ailments, and it was later required that her great right toe be amputated stemming from the wheelchair-related friction injury.

7. The original sentence suspended execution as to all but twenty-one days. The trial court subsequently construed Tarpeh's emergency consent motion to correct the record as a

Super. Ct.Crim. R. 35 motion for reduction of sentencing.

8. There is no dispute that Young was a "vulnerable adult" within the meaning of D.C.Code § 22–932 (2001).

not be tolerated." D.C. Council Report on Bill 13–297 at 7 (May 25, 2000). The Council explained that the Act was "designed to protect elderly people, such as those under nursing care, from malicious and intentional abuse or neglect." *Id.* at 2. Although the legislative history of the Act indicates that the Council's focus was on malicious and intentional abuse, it ultimately enacted a criminal neglect statute that also allows culpability to be based on a caregiver's reckless indifference to the needs of a vulnerable adult. But the placement of "reckless" between "wanton" and "willful" evidences a legislative intent that the standard be a highly demanding one.[9]

According to Black's Law Dictionary, "Recklessness is a state of mind in which the person does not care about the consequences of his or her actions." Black's Law Dictionary 1385 (9th ed.2009). It is a state of mind that falls somewhere between simple negligence, characterized by a person's failure to exercise the degree of care that someone of ordinary prudence would have exercised in the same circumstance, and an intentional or willful decision to cause harm to a person. *Id.* Therefore, in order to be found guilty under this statute for being recklessly indifferent to the needs of a vulnerable adult, there must be at a minimum, among other elements, some evidence presented from which a reasonable fact finder could conclude beyond a reasonable doubt that the defendant did not care about the consequences of his or her inactions.

■ While we have never defined what it means to be recklessly indifferent under this Act, we have faced a similar question in the context of criminal cruelty to children. In *Jones v. United States,* 813 A.2d

220, 225 (D.C.2002), we stated that a defendant acted "recklessly" when he "was aware of and disregarded the grave risk of bodily harm created by his conduct." We also quoted Model Penal Code § 2.02(2)(c), which states that a "person acts recklessly with respect to a material element of an offense when he consciously disregards a substantial and *unjustified* risk that the material element exists or will result from his conduct." (Emphasis added.). Applying those concepts to "reckless indifference" to the needs of a vulnerable person, we conclude that the evidence, as found by the trier of fact, must show not only that the actor did not care about the consequences of his or her action, but also that the actor was consciously aware of the risks involved in light of known alternative courses of action.

Likewise, in cases involving the civil liability of the District of Columbia for claims arising out of the operation of a police car on an emergency run, this court has required a showing of "serious aggravating factors in the conduct of the police officer" so as "to support a finding ... of reckless disregard for the rights and safety of others." *District of Columbia v. Henderson,* 710 A.2d 874, 876, 877 (D.C.1998). In these cases, we have looked for conduct "so extreme as to imply some sort of bad faith," such as violating clear police regulations pertaining to emergency runs, failing to apply the police cruiser's brakes to avoid the crash, or failing to activate the cruiser's emergency lights and headlights. *Henderson,* 710 A.2d at 876 (quoting *District of Columbia v. Walker,* 689 A.2d 40, 44–45 (D.C.1997)) (internal citations omitted).

---

9. This conclusion is supported by the fact that the criminal penalties are the same for criminal neglect as they are for criminal abuse of a vulnerable adult. *See* D.C.Code § 22–936 (2001).

Similarly, we believe that in order to prove "reckless indifference" in this case, the government has to introduce some evidence far beyond the mere fact that the caregiver might not have acted with the degree of care that someone of ordinary prudence would have exercised in the same circumstance.

This is not an unreasonable burden to place on those seeking to convict a person of a criminal offense on the theory that the individual was recklessly indifferent to the needs of a vulnerable adult. Here, for example, had there been evidence introduced that Tarpeh had expressed a lack of remorse or a lack of concern about causing the injury, or had evidence been admitted that she callously turned down offers of assistance, or that there was a clearly superior alternative that she was aware of but chose not to pursue, or that her past conduct demonstrated a lack of caring from which a reasonable fact finder could infer indifference in this case, we might be convinced that the evidence introduced was sufficient to find her guilty of criminal neglect. Here, however, on the contrary, as we shall discuss *infra*, the trial court specifically found that when Tarpeh acted to push Young to the nearest hospital, she just did not know what else to do.

In *Jackson v. United States*, 996 A.2d 796 (D.C.2010), we had our only other occasion to review a sufficiency of the evidence claim relating to a conviction for criminal neglect of a vulnerable adult in violation of D.C.Code § 22–934. In *Jackson*, appellant, a caregiver at an assisted living group home, became involved in a physical altercation with the complainant, a resident of that home who suffered from severe mental retardation. Appellant knew that the complainant possessed a limited ability to communicate and that the complainant suffered bruises and scratches as a result of the altercation. Nevertheless, appellant did absolutely nothing to help the complainant; not only did he fail to seek medical attention for the complainant's injuries, but he failed to report the incident to his supervisor as administratively required. Thus, in that case, unlike the circumstances here, it was undisputed that the appellant knowingly failed to take action to address the complainant's needs.[10] Based on these facts, we affirmed appellant's conviction for criminal neglect of a vulnerable adult in violation of the statute given the severity of the complainant's visible injuries resulting from his encounter with appellant, and appellant's failure to report the matter.

Jackson's actions clearly demonstrated his indifference to the vulnerable adult's well-being. Having been a key party in the altercation with the vulnerable complainant, Jackson was aware of the complainant's bruises and scratches and the risk of leaving the complainant untreated. Jackson did not take any steps to ensure the complainant's health needs, but instead left the complainant alone with his injuries. Jackson had obvious, reasonable, and substantially better alternatives to address the complainant's physical health needs than doing nothing—for example, report the injuries or seek medical assistance. While Jackson's argument on appeal didn't directly address the precise question before us today, his indifference to these clearly superior alternatives allowed the fact finder to infer that his failure to take action was based in large measure on a lack of concern for the well-being of the complainant. This is not the kind of case we have before us now.

---

10. In *Jackson,* appellant argued that the evidence was insufficient to prove that medical care was necessary to maintain the health of the vulnerable adult.

We are satisfied that on the record presented here, as found by the trial court, no rational trier of fact could have found that Tarpeh acted with reckless indifference, as we defined it, to the needs of Young when she acted to push the wheelchair to the nearest hospital. Tarpeh was instructed on the morning in question to take Young, a stroke patient who Tarpeh had not previously assisted and whose medical condition was unknown to Tarpeh, to a dental appointment at the WHC.[11] The trial court found that Tarpeh only became aware of the fact that the wheelchair did not have footrests at the street corner where Young first began to scream and moan in pain. However, by that time, Tarpeh had already pushed Young some distance away from the VA, and as the trial court itself recognized, Tarpeh could not move forward or backward without Young's paralyzed foot dragging on the ground. The wheelchair was heavy, as Young was overweight, and thus, it was difficult for Tarpeh to manipulate Young back into her seat because of Young's partial paralysis and weight, or maneuver the wheelchair in such a way as to ease the problem. Most crucially, the trial court also found that once Tarpeh realized that the footrests were missing and that there was an issue, she "didn't know what to do," so she "crossed the street and went to the nearest hospital she could see." Furthermore, while discussing whether Tarpeh was "criminally negligent," the trial court stated: "I base that on the period of time from when she was aware that there was a problem, that there were no footrests, that the foot was dragging but nevertheless continued to push the wheelchair to the National Rehabilitation Center. I think at that time [Tarpeh] just didn't know what else to do.... She felt she should just get

to the nearest hospital is what I think was going on."

While in hindsight one could argue that Tarpeh could have called Leewood or 911 (although what they could have effectively done from afar at that moment is unclear) or sought assistance from a passer-by (although no affirmative evidence showed that someone was actually available), the failure to do so does not alone constitute "reckless indifference." When you consider the fact that Tarpeh was struggling just to keep Young from falling out of the wheelchair, that Young was virtually unclothed, and that it was a cold winter day, the decision by Tarpeh to push Young to the nearest hospital to get help, even knowing that her foot was dragging on the ground, cannot, by itself, support an inference that Tarpeh was acting with reckless indifference in the face of the trial court's finding that Tarpeh did not know what else to do. Presence of risk does not perfectly equate with "recklessness." A good-faith course of action with tragic consequences does not thereby become a crime under the statute.

On this record, the judgment of conviction must be reversed.

*So ordered.*

Dissenting opinion by Associate Judge FISHER at page 16.

FISHER, Associate Judge, dissenting:

I conclude that the evidence was sufficient to support the conviction for criminal neglect of a vulnerable adult.

There is no doubt that appellant found herself in a difficult situation and faced some difficult choices. Nevertheless, the action she took caused enormous harm to Young, a vulnerable adult. Viewed in light

---

11. The government did not dispute the fact that someone other than Tarpeh prepared Young for transport and placed her in the wheelchair on the morning in question.

of our deferential standard of review,[1] the record supports the trial court's conclusion that appellant acted with reckless indifference to the well-being of her patient.

## I.

When the nurse at the Veterans Affairs Medical Center explained that the Washington Hospital Center ("WHC") was across the street, Tarpeh decided that they could still make Young's dental appointment. She pushed Young outside toward what she thought was the WHC. In fact, Tarpeh was headed in the wrong direction, toward a third hospital in the same complex, the National Rehabilitation Hospital ("NRH").

After several minutes of being pushed in the wheelchair, Young began "screaming." Tarpeh stopped and asked what was wrong, but Young could only moan. Tarpeh then noticed that the blanket covering Young was caught under one of the tires of the wheelchair, so she extracted the blanket, tucked it further underneath Young, and continued to wheel her towards the NRH.

As Tarpeh continued pushing, Young moaned again. She began "fighting and she took the blanket and threw it in the street[.]" At this point, Tarpeh thought that "probably maybe something is wrong with her foot or something." "So I lift the blanket up and I saw her foot was bent under the chair.... [And] that's when I knew there was no footrests on the wheelchair." In addition, Tarpeh saw that Young had no shoes on, and her feet were covered only with socks. Tarpeh and Young were still at least three minutes away from the NRH.

Tarpeh decided to continue pushing Young across the street toward the NRH. But Young, who weighed 250 to 300 pounds, began to "slide off the chair." Over the next few minutes, Young's feet continued dragging across the cement, and Tarpeh saw that Young by then had lost her socks as well. Tarpeh testified that "[t]he reason why her foot was on the ground [was] because she was fighting in the chair." Tarpeh related that Young was "moaning," "wrestling in the chair," and that a "person said her foot was bleeding[.]"

Special Police Officer ("SPO") Rosendo Mejia was working at the front desk of the NRH when he saw Tarpeh and Young approach. "First of all, what caught my attention was a lady coming in a wheelchair screaming, and my first thought was I hold her before she come any further inside because she was bleeding a lot from her feet." Young "didn't have no shoes, nothing like that" and Mejia agreed that "her foot [was] dragging on the floor as the chair was moving[.]" Mejia described how Young's toes had become "folded under what would have been the top of the foot[,]" so that "[t]he top of her foot was on the ground" underneath the wheelchair. Blood was coming from Young's toes and she was "screaming" "[r]eally loud, a lot of pain."

"Because she was bleeding a lot and we didn't want no blood coming inside," SPO Mejia told Tarpeh to stop pushing Young. As Mejia watched, a pool of blood devel-

---

1. We give " 'full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts.' " *Rivas v. United States*, 783 A.2d 125, 134 (D.C.2001) (en banc) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979)). This court "must deem the proof of guilt sufficient if, 'after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " *Id.*

oped on the carpet beneath Young, which Mejia estimated was "at least three feet corner to corner around that area where her feet was[.]" "It's a lot of blood all the way around because she was bleeding a lot."

Mejia issued a rapid response alert and NRH Nursing Supervisor Valerie Canty responded to the scene. Before she had even reached the lobby, Canty "heard a loud moaning from an individual." She ran in and saw Tarpeh standing with Young, who was "almost sliding out of her [wheel]chair"; Nurse Canty did not see anything on Young's feet. "The tip of her buttock was nearing the, the front of the chair and it looked like at any minute she was going to fall out of it." Young was "screaming in pain" and bleeding profusely. "I saw a foot extended [and] a bleeding great toe, spurting forth blood, and I saw like a pool of blood underneath the foot of the individual. It was her right foot and it was the right great toe that had an open area that was spewing forth blood." Canty saw "a 16–inch diameter pool of blood underneath her foot and . . . a nickel sized open fleshy area where the tip of her great toe would be[.]" The toe had no "nail or anything[.]" She immediately began attending to the foot.

Meanwhile, Melissa Brown, a NRH Security Officer, had been patrolling on the second floor of the hospital when she heard "a very loud scream." "The scream was so loud, I knew exactly where to go at the time I heard it." Seconds later, she received Mejia's rapid response call and responded to the first floor lobby where she found Young. Nurse Canty had already begun bandaging the victim's foot, which was bleeding freely. Brown remembered that there "was so much blood leaking out of her foot that while the bandage

was being wrapped, it was turning red at the same time." While the nurse was bandaging Young, "she just screamed. I mean screamed, and she was jumping back in her chair, putting her head back, like she was trying to tell us to stop, basically." "[H]er eyes were just bulging."

Dr. Gerald Chai, a NRH resident physician, arrived shortly afterward and "saw Ms. Young sitting in her wheelchair moaning and screaming." Dr. Chai quickly began addressing a "friction wound" "located on the top of the great toe of the right foot." Because "[t]here was a lot of bleeding coming from the wound[,]" Dr. Chai "applied direct pressure for close to five minutes, . . . [but after doing so] it was still bleeding and it didn't seem like the rate of flow was decreased." [2]

Once the doctors were able to wrap Young's foot and staunch the flow of blood, Young was taken to the Washington Hospital Center, where she was seen by Dr. James Cobey, an orthopedic surgeon. Dr. Cobey observed an open wound on Young's foot "an inch by an inch that was abra[d]ed down to the bone[.]" Dr. Cobey described it as "a horrible wound" that "ripped off the tissue down to the bone[,]" although it "didn't break the bone." Dr. Cobey testified that Young was malnourished, causing her skin tissues to be friable, meaning that they "[b]reak[ ] easily, the skin can just break and tear apart." Because of her condition and the severity of the wound, Dr. Cobey eventually had to amputate Young's toe.

After the conclusion of the evidence, Judge Pan credited the testimony of each of the government's witnesses, and discredited some of Tarpeh's testimony about the events of February 23, 2009. The discredited portion of her testimony seems

---

**2.** Dr. Chai noted later that Young was diabetic and taking a drug called Heparin, an anti-

coagulant, which "thins out the blood and it prolongs some of the bleeding time[.]"

to have related primarily to whether other people assisted Tarpeh and whether she had been cradling Young's foot to keep it from dragging on the ground. However, many of Judge Pan's findings of fact were based on the testimony of Tarpeh, demonstrating that the court credited key parts of Tarpeh's testimony.

## II.

Judge Pan identified the primary question as "whether the conduct here was criminal as opposed to merely negligent. The standard, as expressed in the statute, is that I would need to find that the defendant knowingly, willfully or through a wanton reckless or willful indifference failed to discharge a duty to provide care and services ... that a reasonable person would deem essential for the wellbeing of the vulnerable adult."

The government proceeded on a theory of recklessness, which it defined as "disregard[ing] a substantial risk of the prohibited result," relying on language from *Jones v. United States,* 813 A.2d 220 (D.C.2002), a case involving cruelty to children, another class of vulnerable persons. "Recklessly means that the defendant was aware of and disregarded the grave risk of bodily harm created by his conduct." *Id.* at 225 (quoting jury instruction with approval). In this context, recklessly "does not connote 'malice' or 'evil intent.'" *Id.* Moreover, "a defendant's awareness of a particular fact or risk is ... seldom capable of direct proof and must generally be inferred, if at all, from circumstantial evidence." *Thomas v. United States,* 557 A.2d 1296, 1300 n. 7 (D.C.1989).

The government argued that Tarpeh was reckless from the moment she left Leewood for failing to check on the condition of Young and the wheelchair. Judge Pan rejected this theory, and instead made her determination "base[d] ... on the pe-

riod of time from when she was aware that there was a problem[.]" Judge Pan concluded "that the defendant was on notice from the first corner where Young screamed and moaned[.]" It was "at this point the defendant knew there were no footrests on the wheelchair" and "that this was a problem[.]" Despite being aware that "the complaining witness's foot dragged on the ground for that distance," Tarpeh "nevertheless pushed the wheelchair from that corner to the National Rehabilitation Center." "So the conduct that I think was reckless was, once she realized that there was a problem with the foot, the foot was dragging on the ground, that she continued to push the wheelchair, and continued to push it until she got to the NRH, at least three minutes away, probably more.... And so I do find that that conduct meets the standard of recklessness or wanton reckless or willful indifference that is required in the statute."

I agree.