UNITED STATES of America, Appellee,

v.

Robert CINCA, Appellant.

No. 93–3215.

United States Court of Appeals,
District of Columbia Circuit.

Argued Feb. 21, 1995.

Decided June 13, 1995.

Allen E. Burns, Asst. Federal Public Defender, Washington, DC, argued the cause for appellant. With him on the briefs was A.J. Kramer, Federal Public Defender, Washington, DC.

Preston Burton, Asst. U.S. Atty., Washington, DC, argued the cause for appellee. With him on the brief were Eric H. Holder, Jr., U.S. Atty., John R. Fisher, Roy W. McLeese, III, and Steven W. Pelak, Asst. U.S. Attys., Washington, DC.

Before: EDWARDS, Chief Judge, SENTELLE and HENDERSON, Circuit Judges.

HARRY T. EDWARDS, Chief Judge:

In this case, appellant Robert Cinca challenges his conviction for demonstrating in front of the White House without a permit. The regulations governing the National Capital Region parks require that groups of more than 25 persons have a permit to demonstrate on the sidewalk in front of the White House. The regulations give the ranking United States Park Police officer the authority to revoke a group's permit during the demonstration if the group violates any of the regulations—including a regulation prohibiting stationary signs in the center portion of the sidewalk—or if the event presents a clear and present danger to the public safety, good order or health.

Pursuant to the regulations, a group called Students Against the War secured a permit to demonstrate on the White House sidewalk on January 15, 1991. On that day, appellant Robert Cinca went to the White House by himself to demonstrate against the war in the Persian Gulf. Cinca marched and prayed in front of the White House, and then joined the protest of Students Against the War. Cinca testified that he sat on the center portion of the White House sidewalk with members of Students Against the War and chanted protests with the group. The record shows that the group held signs while sitting on the center portion of the sidewalk, contrary to the regulations, and that the group blocked the sidewalk, forcing pedestrians into the street. The ranking Park Police official on duty at the scene of the demonstration revoked the group's permit. After warning the demonstrators that their permit had been revoked and that those who did not leave the area would be subject to arrest, the Park Police officers arrested the remaining demonstrators. Cinca was one of approximately thirty demonstrators arrested. He was charged with demonstrating without a permit in violation of 36 C.F.R. § 7.96(g)(1), (2), (5), and (6) (1990), and, after a trial before Magistrate Judge Robinson, was convicted of those charges.

■ Appellant challenges the sufficiency of the evidence introduced by the Government to support his conviction. He does not dispute that he was demonstrating on the day of his arrest, nor that he joined the demonstration of Students Against the War. In addition, he does not contest that Students Against the War had a permit and that its permit was revoked by the ranking Park Police officer at the scene of the demonstration. Rather, the principal issue raised by Cinca in this appeal is whether the circum-

stances surrounding the group's protest justified the revocation of the permit. At trial, the Government presented the testimony of two Park Police officers on duty during the demonstration. The officers testified that the demonstrators violated the rules by holding signs while sitting on the center portion of the sidewalk. They also testified that the demonstrators obstructed the sidewalk, effectively forcing pedestrians into the street, which presented a clear and present danger to the public safety, good order or health. We hold, that viewing the evidence in the light most favorable to the Government, as we must, a rational trier of fact could have found beyond a reasonable doubt that Cinca violated 36 C.F.R. § 7.96(g)(1), (2), (5), and (6). Accordingly, we affirm appellant's conviction.

## I. BACKGROUND

The National Park Service regulations at issue in this case govern demonstrations [1] on the White House sidewalk.[2] *See* 36 C.F.R. § 7.96(g). The regulations require a permit

for demonstrations involving more than 25 persons on the White House sidewalk, and exempt individuals or groups of 25 or less persons from the permit requirement. *See id.* § 7.96(g)(2).[3] The regulations grant the ranking U.S. Park Police official the authority to revoke a permit during the demonstration for specified reasons, two of which are at issue in this case. *See id.* § 7.96(g)(6).[4] First, the regulations forbid stationary signs on the center portion of the White House sidewalk. *See id.* § 7.96(g)(5)(viii).[5] Second, the regulations allow the ranking Park Police official to revoke a permit "if continuation of the event presents a clear and present danger to the public safety, good order or health." *Id.* § 7.96(g)(6). Section 1.3 of the regulations criminalizes violations of section 7.96 and provides for punishment by fine or imprisonment. *See id.* § 1.3(a).[6]

Appellant Robert Cinca was charged with demonstrating without a permit on January 15, 1991, in violation of section 7.96(g)(1), (2), (5), and (6). On April 30, 1991, in a bench trial before Magistrate Judge Robinson, the

1. The regulations define the term "demonstrations" to include "demonstrations, picketing, speechmaking, marching, holding vigils or religious services and all other like forms of conduct which involve the communication or expression of views or grievances, engaging in by one or more persons, the conduct of which has the effect, intent or propensity to draw a crowd or onlookers." 36 C.F.R. § 7.96(g)(1)(i).

2. The regulations define "White House sidewalk" as "the south sidewalk of Pennsylvania Avenue NW., between East and West Executive Avenues NW." *Id.* § 7.96(g)(1)(v).

3. The permit provision states:
   Demonstrations and special events may be held only pursuant to a permit issued in accordance with the provisions of this section except:
   (i) Demonstrations involving 25 persons or fewer may be held without a permit *provided* that the other conditions required for the issuance of a permit are met and *provided further* that the group is not merely an extension of another group already availing itself of the 25–person maximum under this provision or will not unreasonably interfere with other demonstrations or special events.
   *Id.* § 7.96(g)(2)(i).

4. The revocation provision provides:
   A permit issued for a demonstration is revocable only upon a ground for which an applica-

   tion therefor would be subject to denial under paragraphs (g)(4) or (5) of this section. . . . During the conduct of a demonstration, a permit may be revoked by the ranking U.S. Park Police supervisory official in charge if continuation of the event presents a clear and present danger to the public safety, good order or health or for any violation of applicable law or regulation.
   *Id.* § 7.96(g)(6).

5. The provision prohibiting stationary signs provides:
   No signs or placards shall be held, placed or set down on the center portion of the White House sidewalk, comprising ten yards on either side of the center point on the sidewalk; *Provided, however,* that individuals may demonstrate while carrying signs on that portion of the sidewalk if they continue to move along the sidewalk.
   *Id.* § 7.96(g)(5)(viii).

6. Section 1.3(a) provides:
   A person convicted of violating a provision of the regulations contained in Parts 1 through 5, 7, 12 and 13 of this chapter, within a park area . . . shall be punished by a fine not exceeding $500 or by imprisonment not exceeding 6 months, or both, and shall be adjudged to pay all costs of the proceedings.
   *Id.* § 1.3(a).

Government presented the testimony of two U.S. Park Police officers on duty at the scene of the demonstration on that day, Sergeant Robert Rule and Officer Jeffrey Hertel. *See United States v. Cinca*, Crim. No. 91–0204M– 01, Trial Tr. ("Tr.") (Apr. 30, 1991) at 6–45, 47–60, *reprinted in* Appendix for Appellant ("App.") 35–74, 76–89. The Government also submitted a video tape recording of the events from approximately 1:30 to 3:00 p.m. *See id.* at 17–18, *reprinted in* App. 46–47. For the defense, appellant testified in his own behalf. *See id.* at 69–89, *reprinted in* App. 98–118.

Cinca, who was a student at the University of Maryland at College Park, testified that on January 15, 1991, he went alone to the White House sidewalk to protest the war in the Persian Gulf. *See id.* at 71–72, *reprinted in* App. 100–01. Cinca testified that, upon arriving at the White House, he marched up and down the sidewalk and then knelt and prayed in protest. *See id.* at 71, 88, *reprinted in* App. 100, 117. According to Cinca, shortly after praying on the sidewalk, sometime between 1 and 2 p.m., he sat down on the sidewalk with approximately twenty other protestors. *See id.* at 83, 85, *reprinted in* App. 112, 114. Cinca testified that the number of demonstrators sitting on the sidewalk rose to approximately sixty people. *See id.* at 83, *reprinted in* App. 112. Cinca also testified that, at times, the group chanted protests against the war, in which Cinca joined. *See id.* at 86–87, *reprinted in* App. 115–16. The group to which Cinca referred was Students Against the War. Prior to the demonstration, the group had secured a permit to demonstrate on that day on the White House sidewalk.[7] *See id.* at 7, 28 (testimony of Sergeant Rule), *reprinted in* App. 36, 57; *id.* at 81 (identifying permit), *reprinted in* App. 110.

Sergeant Rule, who was on duty that day, gave an account that was substantially similar to that stated by Cinca. He testified that on January 15, 1991, at approximately 1 p.m., Students Against the War began "marching on the sidewalk with signs and banners," and that approximately twenty minutes later, "a group of the students sat down in the center portion of the sidewalk." *Id.* at 8, *reprinted in* App. 37. Sergeant Rule testified that "there were people that were seated with signs" in "the center section of the White House sidewalk." *Id.* at 12, *reprinted in* App. 41. He also testified that "the group was seated in a circle, blocking the area between the [White House] fence and the street," and that, because of the closure of the sidewalk, pedestrians were forced to walk in the street. *Id.* at 9–10, 24, *reprinted in* 38–39, 53. Sergeant Rule testified that Major Carl Holmberg was the supervising Park Police official on the scene that day and that Major Holmberg made the decision to revoke the group's permit. *See id.* at 10–13, *reprinted in* App. 39–42.

Sergeant Rule testified that he gave the group three warnings, transmitted over a loudspeaker, *see id.* at 13, *reprinted in* App. 42, in which he stated:

This is Sergeant Rule of the United States Park Police. Your permit to demonstrate on the White House sidewalk has been revoked. You must leave the White House sidewalk at this time or be subject to arrest.

*Id.* at 16, *reprinted in* App. 45. According to Sergeant Rule, approximately twenty individuals left the area in response to the warnings. *See id.* at 14, *reprinted in* App. 43. After the third warning, the officers cordoned off the White House sidewalk at either end and arrested the remaining individuals. *See id.* Approximately thirty demonstrators were arrested that afternoon. *See id.* at 16, *reprinted in* App. 45. Cinca remained in the cordoned area; sometime after the arrests began, he moved to the fence (which was also within the cordoned area) where he again knelt and prayed. *See id.* at 50 (testimony of Officer Hertel), *reprinted in* App. 79; *id.* at 72 (testimony of Cinca), *reprinted in* App. 101. Appellant Cinca was the last individual arrested. *See id.* at 38 (testimony of Sergeant Rule), *reprinted in* App. 67; *id.* at 52

---

7. Students Against the War also had a permit to protest in Lafayette Park. *See* Tr. at 7 (testimony

of Sergeant Rule), *reprinted in* App. 36.

(testimony of Officer Hertel), *reprinted in* App. 81.

The Magistrate Judge found Cinca guilty as charged and sentenced him to time served. *See id.* at 94, *reprinted in* App. 123. Cinca appealed his conviction to the District Court. He argued that the Government offered insufficient evidence to support his conviction and contended that the regulations as applied to him violated his First Amendment rights. The District Court rejected appellant's challenges and affirmed the Magistrate's decision. *See United States v. Cinca,* Crim. No. 93–66, slip op. at 2 (D.D.C. Dec. 9, 1993), *reprinted in* App. 9.

## II. ANALYSIS

On appeal to this court, Cinca again challenges the sufficiency of the Government's evidence to support his conviction, contending that the Government's proof was inadequate because it failed to show that the permit was revoked for valid reasons.[8] In reviewing a sufficiency of the evidence challenge, such as Cinca's, this court considers "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); *see also United States v. Musser,* 873 F.2d 1513, 1519 (D.C.Cir.1989) (finding sufficient evidence that appellant violated regulations prohibiting camping in Lafayette Park). This standard accords great weight to the factfinder's role, "allowing the government the benefit of all reasonable inferences that may be drawn from the evidence, and permitting the [factfinder] to determine the weight and credibility of the evidence." *United States v. Thomas,* 864 F.2d 188, 191 (D.C.Cir.1988) (internal quotations omitted) (finding sufficient evidence that appellant violated regulations prohibiting camping in Lafayette Park).

Most of the evidence supporting the elements of Cinca's section 7.96(g) offense is uncontested. Appellant's challenge centers on the sufficiency of the evidence establishing valid reasons for the revocation of Students Against the War's permit. In particular, Cinca contends that the Government's evidence was insufficient because it failed to present the testimony of Major Holmberg, the ranking Park Police officer, as to why he revoked the group's permit. We hold that the Government presented sufficient evidence regarding the circumstances surrounding the demonstration at the White House on January 15, 1991, to justify the ranking Park Police officer's revocation of the group's permit.

Our analysis in this case is guided by the language of the regulations. Section 7.96(g)(2) provides that "[d]emonstrations ... may be held only pursuant to a permit issued in accordance with the provisions of this section." It is undisputed that Students Against the War secured a permit to demonstrate on the White House sidewalk on January 15, 1991, in compliance with 36 C.F.R. § 7.96(g)(2). *See* Brief for Appellant at 31 ("It was undisputed at trial that ... a permit was required for an organized demonstration of more than 25 people; and that a permit had indeed been issued to one group and was in effect when the demonstrating began."). Cinca also does not deny that he demonstrated at the White House sidewalk on January 15, 1991. *See id.*

■ Moreover, viewing the evidence in the light most favorable to the Government, there can be no real dispute that appellant Cinca joined the Students Against the War demonstration at the White House on that day. Both officers, Sergeant Rule and Officer Hertel, testified that appellant was sitting with the group when Sergeant Rule gave the warnings that the group's permit had been revoked and that remaining demonstrators would be subject to arrest.[9] Appellant

---

8. Appellant also claims that the regulations, as applied to him, violated his First Amendment rights. *See* note 12 *infra.*

9. *See id.* at 37 (Sergeant Rule testifying that Cinca "was seated in the circle of demonstrators" in the center portion of the White House

sidewalk), *reprinted in* App. 66; *id.* at 38 (Sergeant Rule testifying that Cinca "was seated on the west side of the circle of demonstrators"), *reprinted in* App. 67; *id.* at 49 (Officer Hertel testifying that Cinca "was one of the demonstrators who sat down"), *reprinted in* App. 78.

essentially conceded this point before this court. *See id.* ("It was undisputed at trial that Mr. Cinca was one of more than 50 persons ultimately involved in the demonstrating ... that began on the White House sidewalk at about 1:00 p.m. on January 15, 1991."). And Cinca's testimony at trial clearly supports his concession before this court.[10] Once Cinca joined the group, he was subject to the regulations governing the group's demonstration. Cinca makes no claims to the contrary on these points. Thus, this is plainly not a case in which an individual, protesting by himself or herself, is suddenly swept into a group against his or her will.[11] Nor is this a case in which an individual is charged with the group's violations of regulations, without having joined the group's demonstration. Our decision today does not address those scenarios.[12]

█ Rather, Cinca's challenge requires us to address only whether the permit was properly revoked. The regulations provide that "[d]uring the conduct of a demonstration, a permit may be revoked by the ranking U.S. Park Police supervisory official in charge" if certain conditions exist. 36 C.F.R. § 7.96(g)(6). The Government presented un-

controverted testimony that the group's permit to demonstrate on the White House sidewalk was revoked, and that Major Holmberg, the ranking Park Police supervisory official in charge that day, made the decision to revoke the group's permit. *See* Tr. at 10–11, *reprinted in* App. 39–40. Appellant does not dispute that Major Holmberg was the ranking officer that day nor that he made the decision to revoke the group's permit. *See* Brief for Appellant at 32 ("The only 'ranking U.S. Park Police supervisory official in charge' during the demonstration was Major Holmberg."). Thus, it is undisputed that the individual who revoked the group's permit to demonstrate on the White House sidewalk on January 15, 1991 had the authority to do so under the regulations.

The principal issue in this case is whether circumstances existed to justify the revocation of Students Against the War's permit. The regulations provide that a permit may be revoked "only upon a ground for which an application therefor would be subject to denial under paragraphs (g)(4) or (5) of this section," and, more generally, that "a permit may be revoked ... for any violation of applicable ... regulation." 36 C.F.R.

---

10. At trial, Cinca described the demonstration as a "sit-in ... people were just sitting," *id.* at 72, *reprinted in* App. 101, and testified that he sat with the group on the White House sidewalk and that he chanted slogans against the war with them, *see id.* at 82 (testifying in response to counsel's question, "you and the other students in the group were seated on the sidewalk, correct?," Cinca stated, "[y]es"), *reprinted in* App. 111; *id.* at 86–87 (testifying in response to counsel's question, "[t]he group that was seated on the sidewalk along with you, you were all chanting in unison at times, correct?," Cinca stated, "[y]es, at times"), *reprinted in* App. 115–16; *id.* at 87 (testifying in response to counsel's question, "you were chanting protests together against the war, is that correct?," Cinca stated, "[a]t times"), *reprinted in* App. 116. Cinca testified that when the warnings were given by Sergeant Rule, he was sitting with approximately fifty people on the sidewalk. *See id.*

11. As the District Court noted, "[t]he Park Service's warnings defeat any argument that [appellant] did not have adequate notice that the Park Service officials considered him to be part of the group of students demonstrating under the revoked permit in violation of § 7.96(g)(2)(i)." *Cinca,* Crim. No. 93–66, slip op. at 5, *reprinted in* App. 12.

12. Indeed, this fact disposes of Cinca's as-applied First Amendment challenge. In his brief before this court, Cinca claimed that the regulations, as applied to Cinca, were "unconstitutionally vague and/or overbroad, and they deprived him of due process of law." Brief for Appellant at 34. Cinca argued that *he* was not holding a sign, and therefore, the Park Police acted unreasonably in applying the stationary sign regulations *to him. See id.* at 35–36. However, Cinca was not a lone protestor on January 15, 1991; rather, *he joined the group,* Students Against the War, and as a participant in the group's demonstration was subject to the regulations *as applied to the group.*

Cinca does not challenge the constitutionality of the regulations as applied to the group. Therefore, it is sufficient to note that the regulations prohibiting stationary signs in the center portion of the White House sidewalk have been upheld as facially constitutional. *See White House Vigil v. Clark,* 746 F.2d 1518, 1534–38 (D.C.Cir.1984); *see also United States v. Grace,* 778 F.2d 818, 820 (D.C.Cir.1985) (noting that *White House Vigil* determined that regulation banning stationary signs in center zone of White House sidewalk is constitutional).

§ 7.96(g)(6). Section 7.96(g)(5)(viii) mandates that individuals carrying signs on the center portion of the White House sidewalk must continue to move along the sidewalk, providing that "[n]o signs or placards shall be held, placed or set down on the center portion of the White House sidewalk," but allowing individuals to "demonstrate while carrying signs on that portion of the sidewalk if they continue to move along the sidewalk." *Id.* § 7.96(g)(5)(viii). Read together, these two provisions indicate that a permit may be revoked if demonstrators sit on the center portion of the sidewalk with their signs.

Viewed in a light most favorable to the Government, a reasonable factfinder could certainly conclude that the group sat on the center portion of the sidewalk holding signs in violation of the regulations. Sergeant Rule testified that "at approximately [1:20 p.m.] a group of the students sat down in the center portion of the sidewalk, holding signs." Tr. at 8, *reprinted in* App. 37. Sergeant Rule explained that "by CFR statute, people are not allowed to stand still with signs; they're required to keep moving. And there were people that were seated with signs." *Id.* at 12, *reprinted in* App. 41. There was clearly sufficient evidence that the circumstances surrounding the demonstration justified the revocation of the permit.

In fact, the record reveals a second ground justifying the revocation of the group's permit. The regulations allow the ranking Park Police officer to revoke a demonstration permit if "continuation of the event presents a clear and present danger to the public safety, good order or health." 36 C.F.R. § 7.96(g)(6). Here again, a reasonable factfinder, viewing the trial testimony in the light most favorable to the Government, could conclude that the demonstration effectively blocked the sidewalk and forced pedestrians into the street, thereby creating a clear and present danger to the public safety

and good order. Sergeant Rule testified that the group of students sitting, which included Cinca, was blocking the sidewalk. He stated: "the sidewalk runs from the White House fence, on its south side, to Pennsylvania Avenue on its north side, and the group was seated in a circle, blocking the area between the fence and the street." Tr. at 9, *reprinted in* App. 38. "At times," he testified, the sidewalk "was completely blocked; at other times, one person could get through." [13] *Id.* Sergeant Rule then explained that "because of the closure of the sidewalk and forcing people out into the streets, pedestrians who were walking on the sidewalk, a decision was made by Major Holmberg, the ranking officer that day, to revoke the permit." *Id.* at 10, *reprinted in* App. 39. Sergeant Rule also testified that at one point, the seated protestors "locked arms." *Id.* at 37, *reprinted in* App. 66. Accordingly, the evidence introduced at trial was sufficient, such that the Magistrate could conclude beyond a reasonable doubt that the permit was properly revoked on two separate bases.

■ Appellant contends that the Government failed to adequately prove its case because it did not present the testimony of Major Holmberg as to his subjective reasons for revoking the permit. However, nothing in the language of the regulations suggests that in order to secure a conviction, the Government must show the subjective reasons behind the ranking Park Police officer's decision to revoke a permit. The regulations provide that "a permit may be revoked by the ranking U.S. Park Police supervisory official in charge if continuation of the event presents a clear and present danger to the public safety, good order or health or for any violation of applicable law or regulation." 36 C.F.R. § 7.96(g)(6). Absent some showing that the ranking Park Police official harbors an illegitimate motive, suggesting some pre-

---

**13.** Although Sergeant Rule testified that "[t]here was a small space, but [pedestrians] would have to have walked single file to try and get through there," Tr. at 25, *reprinted in* App. 54, and Cinca corroborated that account, stating that, pedestrians "had room for at least single file, in some places even more than that," *id.* at 77, *reprinted in* App. 106, this account does not defeat the claim that the students' circle presented a danger

to public safety and order. As the District Court noted, "[i]t is reasonable to conclude that a partial, and yet substantial, obstruction could endanger or threaten the flow of pedestrian and motor vehicle traffic, so as to present 'a clear and present danger to the public safety, good order or health.'" *Cinca*, Crim. No. 93–66, slip op. at 7, *reprinted in* App. 14.

text, a factfinder may reasonably look to the circumstances surrounding the demonstration as proof of a proper revocation. In this case, appellant points to no evidence indicating that Major Holmberg revoked the group's permit for reasons other than the circumstances about which Sergeant Rule and Officer Hertel testified. And the Government surely was not required to prove a negative on this point. The evidence in this case was entirely sufficient for a reasonable factfinder to conclude that Major Holmberg revoked the group's permit for either of the two valid reasons described in the record.

In summary, we find that the record contains sufficient evidence to sustain the conviction. It was uncontested that appellant Cinca joined the demonstration of the Students Against the War and that the group had secured a permit prior to its demonstration. Additionally, it was uncontested that the group's permit was revoked by the ranking Park Police officer at the scene of the demonstration that day. Viewing the evidence in the light most favorable to the Government, a reasonable factfinder could have concluded that the circumstances surrounding the demonstration justified the revocation of the group's permit. After the permit had been revoked, appellant continued to demonstrate with approximately 30 other demonstrators, and thus violated the National Capital Region parks regulations. Accordingly, we affirm his conviction.

### III. Conclusion

For the foregoing reasons, the judgment of the District Court is affirmed.

*So ordered.*